# MOORE *v.* CITY OF EAST CLEVELAND, OHIO

No. 75–6289.   Argued November 2, 1976—Decided May 31, 1977

*Edward R. Stege, Jr.*, argued the cause for appellant. With him on the brief were *Francis D. Murtaugh, Jr.*, and *Lloyd B. Snyder.*

*Leonard Young* argued the cause for appellee. With him on the brief was *Henry B. Fischer.**

MR. JUSTICE POWELL announced the judgment of the Court, and delivered an opinion in which MR. JUSTICE BRENNAN, MR. JUSTICE MARSHALL, and MR. JUSTICE BLACKMUN joined.

East Cleveland's housing ordinance, like many throughout the country, limits occupancy of a dwelling unit to members

---

*\*Melvin L. Wulf* and *Benjamin Sheerer* filed a brief for the American Civil Liberties Union et al. as *amici curiae.*

of a single family. § 1351.02.[1] But the ordinance contains an unusual and complicated definitional section that recognizes as a "family" only a few categories of related individuals. § 1341.08.[2] Because her family, living together in her home, fits none of those categories, appellant stands convicted of a criminal offense. The question in this case is whether the ordinance violates the Due Process Clause of the Fourteenth Amendment.[3]

I

Appellant, Mrs. Inez Moore, lives in her East Cleveland home together with her son, Dale Moore, Sr., and her two grandsons, Dale, Jr., and John Moore, Jr. The two boys are first cousins rather than brothers; we are told that John

---

[1] All citations by section number refer to the Housing Code of the city of East Cleveland, Ohio.

[2] Section 1341.08 (1966) provides:

" 'Family' means a number of individuals related to the nominal head of the household or to the spouse of the nominal head of the household living as a single housekeeping unit in a single dwelling unit, but limited to the following:

"(a) Husband or wife of the nominal head of the household.

"(b) Unmarried children of the nominal head of the household or of the spouse of the nominal head of the household, provided, however, that such unmarried children have no children residing with them.

"(c) Father or mother of the nominal head of the household or of the spouse of the nominal head of the household.

"(d) Notwithstanding the provisions of subsection (b) hereof, a family may include not more than one dependent married or unmarried child of the nominal head of the household or of the spouse of the nominal head of the household and the spouse and dependent children of such dependent child. For the purpose of this subsection, a dependent person is one who has more than fifty percent of his total support furnished for him by the nominal head of the household and the spouse of the nominal head of the household.

"(e) A family may consist of one individual."

[3] Appellant also claims that the ordinance contravenes the Equal Protection Clause, but it is not necessary for us to reach that contention.

came to live with his grandmother and with the elder and younger Dale Moores after his mother's death.[4]

In early 1973, Mrs. Moore received a notice of violation from the city, stating that John was an "illegal occupant" and directing her to comply with the ordinance. When she failed to remove him from her home, the city filed a criminal charge. Mrs. Moore moved to dismiss, claiming that the ordinance was constitutionally invalid on its face. Her motion was overruled, and upon conviction she was sentenced to five days in jail and a $25 fine. The Ohio Court of Appeals affirmed after giving full consideration to her constitutional claims,[5]

---

[4] Brief for Appellant 4, 25. John's father, John Moore, Sr., has apparently been living with the family at least since the time of trial. Whether he was living there when the citation was issued is in dispute. Under the ordinance his presence too probably would be a violation. But we take the case as the city has framed it. The citation that led to prosecution recited only that John Moore, Jr., was in the home in violation of the ordinance.

[5] The dissenting opinion of THE CHIEF JUSTICE suggests that Mrs. Moore should be denied a hearing in this Court because she failed to seek discretionary administrative relief in the form of a variance, relief that is no longer available. There are sound reasons for requiring exhaustion of administrative remedies in some situations, but such a requirement is wholly inappropriate where the party is a *criminal defendant* in circumstances like those present here. See generally *McKart* v. *United States*, 395 U. S. 185 (1969). Mrs. Moore defends against the State's prosecution on the ground that the ordinance is facially invalid, an issue that the zoning review board lacks competency to resolve. In any event, this Court has never held that a general principle of exhaustion could foreclose a criminal defendant from asserting constitutional invalidity of the statute under which she is being prosecuted. See, *e. g., Yakus* v. *United States*, 321 U. S. 414, 446–447 (1944).

Moreover, those cases that have denied certain nonconstitutional defenses to criminal defendants for failure to exhaust remedies did so pursuant to statutes that implicitly or explicitly mandated such a holding. See, *e. g., Falbo* v. *United States*, 320 U. S. 549 (1944); *Yakus* v. *United States, supra; McGee* v. *United States*, 402 U. S. 479 (1971). Because of the statutes the defendants were on notice that failure to pursue avail-

and the Ohio Supreme Court denied review. We noted probable jurisdiction of her appeal, 425 U. S. 949 (1976).

## II

The city argues that our decision in *Village of Belle Terre* v. *Boraas*, 416 U. S. 1 (1974), requires us to sustain the ordinance attacked here. Belle Terre, like East Cleveland, imposed limits on the types of groups that could occupy a single dwelling unit. Applying the constitutional standard announced in this Court's leading land-use case, *Euclid* v. *Ambler Realty Co.*, 272 U. S. 365 (1926),[6] we sustained the Belle Terre ordinance on the ground that it bore a rational relationship to permissible state objectives.

But one overriding factor sets this case apart from *Belle Terre*. The ordinance there affected only *unrelated* individuals. It expressly allowed all who were related by "blood, adoption, or marriage" to live together, and in sustaining the ordinance we were careful to note that it promoted "family needs" and "family values." 416 U. S., at 9. East Cleveland, in contrast, has chosen to regulate the occupancy of its housing by slicing deeply into the family itself. This is no mere incidental result of the ordinance. On its face it selects cer-

---

able administrative relief might result in forfeiture of a defense in an enforcement proceeding. But here no Ohio statute or ordinance required exhaustion or gave Mrs. Moore any such warning. Indeed, the Ohio courts entertained all her claims, perceiving no denigration of state administrative process in according full judicial review.

[6] *Euclid* held that land-use regulations violate the Due Process Clause if they are "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." 272 U. S., at 395. See *Nectow* v. *Cambridge*, 277 U. S. 183, 188 (1928). Later cases have emphasized that the general welfare is not to be narrowly understood; it embraces a broad range of governmental purposes. See *Berman* v. *Parker*, 348 U. S. 26 (1954). But our cases have not departed from the requirement that the government's chosen means must rationally further some legitimate state purpose.

tain categories of relatives who may live together and declares that others may not. In particular, it makes a crime of a grandmother's choice to live with her grandson in circumstances like those presented here.

When a city undertakes such intrusive regulation of the family, neither *Belle Terre* nor *Euclid* governs; the usual judicial deference to the legislature is inappropriate. "This Court has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment." *Cleveland Board of Education* v. *LaFleur,* 414 U. S. 632, 639–640 (1974). A host of cases, tracing their lineage to *Meyer* v. *Nebraska,* 262 U. S. 390, 399–401 (1923), and *Pierce* v. *Society of Sisters,* 268 U. S. 510, 534–535 (1925), have consistently acknowledged a "private realm of family life which the state cannot enter." *Prince* v. *Massachusetts,* 321 U. S. 158, 166 (1944). See, *e. g., Roe* v. *Wade,* 410 U. S. 113, 152–153 (1973); *Wisconsin* v. *Yoder,* 406 U. S. 205, 231–233 (1972); *Stanley* v. *Illinois,* 405 U. S. 645, 651 (1972); *Ginsberg* v. *New York,* 390 U. S. 629, 639 (1968); *Griswold* v. *Connecticut,* 381 U. S. 479 (1965); *id.,* at 495–496 (Goldberg, J., concurring); *id.,* at 502–503 (WHITE, J., concurring); *Poe* v. *Ullman,* 367 U. S. 497, 542–544, 549–553 (1961) (Harlan, J., dissenting); cf. *Loving* v. *Virginia,* 388 U. S. 1, 12 (1967); *May* v. *Anderson,* 345 U. S. 528, 533 (1953); *Skinner* v. *Oklahoma ex rel. Williamson,* 316 U. S. 535, 541 (1942). Of course, the family is not beyond regulation. See *Prince* v. *Massachusetts, supra,* at 166. But when the government intrudes on choices concerning family living arrangements, this Court must examine carefully the importance of the governmental interests advanced and the extent to which they are served by the challenged regulation. See *Poe* v. *Ullman, supra,* at 554 (Harlan, J., dissenting).

When thus examined, this ordinance cannot survive. The city seeks to justify it as a means of preventing over-

crowding, minimizing traffic and parking congestion, and avoiding an undue financial burden on East Cleveland's school system. Although these are legitimate goals, the ordinance before us serves them marginally, at best.[7] For example, the ordinance permits any family consisting only of husband, wife, and unmarried children to live together, even if the family contains a half dozen licensed drivers, each with his or her own car. At the same time it forbids an adult brother and sister to share a household, even if both faithfully use public transportation. The ordinance would permit a grandmother to live with a single dependent son and children, even if his school-age children number a dozen, yet it forces Mrs. Moore to find another dwelling for her grandson John, simply because of the presence of his uncle and cousin in the same household. We need not labor the point. Section 1341.08 has but a tenuous relation to alleviation of the conditions mentioned by the city.

### III

The city would distinguish the cases based on *Meyer* and *Pierce.* It points out that none of them "gives grandmothers any fundamental rights with respect to grandsons," Brief for Appellee 18, and suggests that any constitutional right to live together as a family extends only to the nuclear family— essentially a couple and their dependent children.

To be sure, these cases did not expressly consider the family relationship presented here. They were immediately concerned with freedom of choice with respect to childbearing, *e. g., LaFleur, Roe* v. *Wade, Griswold, supra,* or with the rights

---

[7] It is significant that East Cleveland has another ordinance specifically addressed to the problem of overcrowding. See *United States Dept. of Agriculture* v. *Moreno,* 413 U. S. 528, 536–537 (1973). Section 1351.03 limits population density directly, tying the maximum permissible occupancy of a dwelling to the habitable floor area. Even if John, Jr., and his father both remain in Mrs. Moore's household, the family stays well within these limits.

of parents to the custody and companionship of their own children, *Stanley* v. *Illinois, supra,* or with traditional parental authority in matters of child rearing and education. *Yoder, Ginsberg, Pierce, Meyer, supra.* But unless we close our eyes to the basic reasons why certain rights associated with the family have been accorded shelter under the Fourteenth Amendment's Due Process Clause, we cannot avoid applying the force and rationale of these precedents to the family choice involved in this case.

Understanding those reasons requires careful attention to this Court's function under the Due Process Clause. Mr. Justice Harlan described it eloquently:

> "Due process has not been reduced to any formula; its content cannot be determined by reference to any code. The best that can be said is that through the course of this Court's decisions it has represented the balance which our Nation, built upon postulates of respect for the liberty of the individual, has struck between that liberty and the demands of organized society. If the supplying of content to this Constitutional concept has of necessity been a rational process, it certainly has not been one where judges have felt free to roam where unguided speculation might take them. The balance of which I speak is the balance struck by this country, having regard to what history teaches are the traditions from which it developed as well as the traditions from which it broke. That tradition is a living thing. A decision of this Court which radically departs from it could not long survive, while a decision which builds on what has survived is likely to be sound.[8] No formula could serve as a substitute, in this area, for judgment and restraint.

---

[8] This explains why *Meyer* and *Pierce* have survived and enjoyed frequent reaffirmance, while other substantive due process cases of the same era have been repudiated—including a number written, as were *Meyer* and *Pierce,* by Mr. Justice McReynolds.

". . . [T]he full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution. This 'liberty' is not a series of isolated points pricked out in terms of the taking of property; the freedom of speech, press, and religion; the right to keep and bear arms; the freedom from unreasonable searches and seizures; and so on. It is a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints, . . . and which also recognizes, what a reasonable and sensitive judgment must, that certain interests require particularly careful scrutiny of the state needs asserted to justify their abridgment." *Poe* v. *Ullman, supra,* at 542–543 (dissenting opinion).

Substantive due process has at times been a treacherous field for this Court. There *are* risks when the judicial branch gives enhanced protection to certain substantive liberties without the guidance of the more specific provisions of the Bill of Rights. As the history of the *Lochner* era demonstrates, there is reason for concern lest the only limits to such judicial intervention become the predilections of those who happen at the time to be Members of this Court.[9] That history counsels caution and restraint. But it does not counsel abandonment, nor does it require what the city urges here: cutting off any protection of family rights at the first convenient, if arbitrary boundary—the boundary of the nuclear family.

---

[9] *Lochner* v. *New York,* 198 U. S. 45 (1905). See *North Dakota Pharmacy Bd.* v. *Snyder's Drug Stores, Inc.,* 414 U. S. 156, 164–167 (1973); *Griswold* v. *Connecticut,* 381 U. S. 479, 514–527 (1965) (Black, J., dissenting); *Ferguson* v. *Skrupa,* 372 U. S. 726 (1963); *Baldwin* v. *Missouri,* 281 U. S. 586, 595 (1930) (Holmes, J., dissenting); G. Günther, Cases and Materials on Constitutional Law 550–596 (9th ed. 1975).

Appropriate limits on substantive due process come not from drawing arbitrary lines but rather from careful "respect for the teachings of history [and] solid recognition of the basic values that underlie our society." [10] *Griswold* v. *Connecticut,* 381 U. S., at 501 (Harlan, J., concurring).[11] See generally *Ingraham* v. *Wright,* 430 U. S. 651, 672–674, and nn. 41, 42 (1977); *Joint Anti-Fascist Refugee Committee* v. *McGrath,* 341 U. S. 123, 162–163 (1951) (Frankfurter, J., concurring); *Lochner* v. *New York,* 198 U. S. 45, 76 (1905) (Holmes, J., dissenting). Our decisions establish that the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition.[12] It is through the family that we inculcate and

---

[10] A similar restraint marks our approach to the questions whether an asserted substantive right is entitled to heightened solicitude under the Equal Protection Clause because it is "explicitly or implicitly guaranteed by the Constitution," *San Antonio Independent School Dist.* v. *Rodriguez,* 411 U. S. 1, 33–34 (1973), and whether or to what extent a guarantee in the Bill of Rights should be "incorporated" in the Due Process Clause because it is "necessary to an Anglo-American regime of ordered liberty." *Duncan* v. *Louisiana,* 391 U. S. 145, 149–150, n. 14 (1968); see *Johnson* v. *Louisiana,* 406 U. S. 356, 372 n. 9 (1972) (opinion of POWELL, J.).

[11] For a recent suggestion that the holding in *Griswold* is best understood in this fashion, see Pollak, Comment, 84 Yale L. J. 638, 650–653 (1975). "[I]n due course we will see *Griswold* as a reaffirmation of the Court's continuing obligation to test the justifications offered by the state for state-imposed constraints which significantly hamper those modes of individual fulfillment which are at the heart of a free society." *Id.,* at 653.

[12] In *Wisconsin* v. *Yoder,* 406 U. S. 205 (1972), the Court rested its holding in part on the constitutional right of parents to assume the primary role in decisions concerning the rearing of their children. That right is recognized because it reflects a "strong tradition" founded on "the history and culture of Western civilization," and because the parental role "is now established beyond debate as an enduring American tradition." *Id.,* at 232. In *Ginsberg* v. *New York,* 390 U. S. 629 (1968), the Court spoke of the same right as "basic in the structure of our society." *Id.,* at 639. *Griswold* v. *Connecticut, supra,* struck down Connecticut's anticon-

pass down many of our most cherished values, moral and cultural.[13]

Ours is by no means a tradition limited to respect for the bonds uniting the members of the nuclear family. The tradition of uncles, aunts, cousins, and especially grandparents sharing a household along with parents and children has roots equally venerable and equally deserving of constitutional recognition.[14]    Over the years millions

---

traception statute.    Three concurring Justices, relying on both the Ninth and Fourteenth Amendments, emphasized that "the traditional relation of the family" is "a relation as old and as fundamental as our entire civilization."    381 U. S., at 496 (Goldberg, J., joined by Warren, C. J., and BRENNAN, J., concurring).    Speaking of the same statute as that involved in *Griswold*, Mr. Justice Harlan wrote, dissenting in *Poe* v. *Ullman*, 367 U. S. 497, 551–552 (1961) : "[H]ere we have not an intrusion into the home so much as on the life which characteristically has its place in the home. . . .    The home derives its pre-eminence as the seat of family life. And the integrity of that life is something so fundamental that it has been found to draw to its protection the principles of more than one explicitly granted Constitutional right."

Although he agrees that the Due Process Clause has substantive content, MR. JUSTICE WHITE in dissent expresses the fear that our recourse to history and tradition will "broaden enormously the horizons of the Clause." *Post*, at 549–550.    To the contrary, an approach grounded in history imposes limits on the judiciary that are more meaningful than any based on the abstract formula taken from *Palko* v. *Connecticut*, 302 U. S. 319 (1937), and apparently suggested as an alternative.    Cf. *Duncan* v. *Louisiana*, *supra*, at 149–150, n. 14 (rejecting the *Palko* formula as the basis for deciding what procedural protections are required of a State, in favor of a historical approach based on the Anglo-American legal tradition).    Indeed, the passage cited in MR. JUSTICE WHITE's dissent as "most accurately reflect[ing] the thrust of prior decisions" on substantive due process, *post*, at 545, expressly points to history and tradition as the source for "supplying . . . content to this Constitutional concept."    *Poe* v. *Ullman*, *supra*, at 542 (Harlan, J., dissenting).

[13] See generally Wilkinson & White, Constitutional Protection for Personal Lifestyles, 62 Cornell L. Rev. 563, 623–624 (1977).

[14] See generally B. Yorburg, The Changing Family (1973) ; Bronfenbrenner, The Calamitous Decline of the American Family, Washington

of our citizens have grown up in just such an environment, and most, surely, have profited from it. Even if conditions of modern society have brought about a decline in extended family households, they have not erased the accumulated wisdom of civilization, gained over the centuries and honored throughout our history, that supports a larger conception of the family. Out of choice, necessity, or a sense of family responsibility, it has been common for close relatives to draw together and participate in the duties and the satisfactions of a common home. Decisions concerning child rearing, which *Yoder, Meyer, Pierce* and other cases have recognized as entitled to constitutional protection, long have been shared with grandparents or other relatives who occupy the same household—indeed who may take on major responsibility for the rearing of the children.[15] Especially in times of adversity, such as the death of a spouse or economic need, the broader family has tended to come together for mutual sustenance and to maintain or rebuild a secure home life. This is apparently what happened here.[16]

Whether or not such a household is established because of personal tragedy, the choice of relatives in this degree

---

Post, Jan. 2, 1977, p. C1. Recent census reports bear out the importance of family patterns other than the prototypical nuclear family. In 1970, 26.5% of all families contained one or more members over 18 years of age, other than the head of household and spouse. U. S. Department of Commerce, 1970 Census of Population, vol. 1, pt. 1, Table 208. In 1960 the comparable figure was 26.1%. U. S. Department of Commerce, 1960 Census of Population, vol. 1, pt. 1, Table 187. Earlier data are not available.

[15] Cf. *Prince* v. *Massachusetts*, 321 U. S. 158 (1944), which spoke broadly of family authority as against the State, in a case where the child was being reared by her aunt, not her natural parents.

[16] We are told that the mother of John Moore, Jr., died when he was less than one year old. He, like uncounted others who have suffered a similar tragedy, then came to live with the grandmother to provide the infant with a substitute for his mother's care and to establish a more normal home environment. Brief for Appellant 25.

of kinship to live together may not lightly be denied by the State. *Pierce* struck down an Oregon law requiring all children to attend the State's public schools, holding that the Constitution "excludes any general power of the State to standardize its children by forcing them to accept instruction from public teachers only." 268 U. S., at 535. By the same token the Constitution prevents East Cleveland from standardizing its children—and its adults—by forcing all to live in certain narrowly defined family patterns.

*Reversed.*

MR. JUSTICE BRENNAN, with whom MR. JUSTICE MARSHALL joins, concurring.

I join the plurality's opinion. I agree that the Constitution is not powerless to prevent East Cleveland from prosecuting as a criminal and jailing[1] a 63-year-old grandmother for refusing to expel from her home her now 10-year-old grandson who has lived with her and been brought up by her since his mother's death when he was less than a year old.[2] I do not question that a municipality may constitutionally zone to

---

[1] This is a criminal prosecution which resulted in the grandmother's conviction and sentence to prison and a fine. Section 1345.99 permits imprisonment of up to six months, and a fine of up to $1,000, for violation of any provision of the Housing Code. Each day such violation continues may, by the terms of this section, constitute a separate offense.

[2] Brief for Appellant 4. In addition, we were informed by appellant's counsel at oral argument that

"application of this ordinance here would not only sever and disrupt the relationship between Mrs. Moore and her own son, but it would disrupt the relationship that is established between young John and young Dale, which is in essence a sibling type relationship, and it would most importantly disrupt the relationship between young John and his grandmother, which is the only maternal influence that he has had during his entire life." Tr. of Oral Arg. 16.

The city did not dispute these representations, and it is clear that this case was argued from the outset as requiring decision in this context.

alleviate noise and traffic congestion and to prevent over-crowded and unsafe living conditions, in short to enact reasonable land-use restrictions in furtherance of the legitimate objectives East Cleveland claims for its ordinance. But the zoning power is not a license for local communities to enact senseless and arbitrary restrictions which cut deeply into private areas of protected family life. East Cleveland may not constitutionally define "family" as essentially confined to parents and the parents' own children.[3] The plurality's opinion conclusively demonstrates that classifying family patterns in this eccentric way is not a rational means of achieving the ends East Cleveland claims for its ordinance, and further that the ordinance unconstitutionally abridges the "freedom of personal choice in matters of . . . family life [that] is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment." *Cleveland Board of Education* v. *LaFleur*, 414 U. S. 632, 639–640 (1974). I write only to underscore the cultural myopia of the arbitrary boundary drawn by the East Cleveland ordinance in the light of the tradition of the American home that has been a feature of our society since our beginning as a Nation—the "tradition" in the plurality's words, "of uncles, aunts, cousins, and especially grandparents sharing a household along with parents and children . . . ." *Ante,* at 504. The line drawn by this ordi-

---

[3] The East Cleveland ordinance defines "family" to include, in addition to the spouse of the "nominal head of the household," the couple's childless unmarried children, but only one dependent child (married or unmarried) having dependent children, and one parent of the nominal head of the household or of his or her spouse. Thus an "extended family" is authorized in only the most limited sense, and "family" is essentially confined to parents and their own children. Appellant grandmother was charged with violating the ordinance because John, Jr., lived with her at the same time her other grandson, Dale, Jr., was also living in the home; the latter is classified as an "unlicensed roomer" authorized by the ordinance to live in the house.

nance displays a depressing insensitivity toward the economic and emotional needs of a very large part of our society.

In today's America, the "nuclear family" is the pattern so often found in much of white suburbia. J. Vander Zanden, Sociology: A Systematic Approach 322 (3d ed. 1975). The Constitution cannot be interpreted, however, to tolerate the imposition by government upon the rest of us of white suburbia's preference in patterns of family living. The "extended family" that provided generations of early Americans with social services and economic and emotional support in times of hardship, and was the beachhead for successive waves of immigrants who populated our cities,[4] remains not merely still a pervasive living pattern, but under the goad of brutal economic necessity, a prominent pattern—virtually a means of survival— for large numbers of the poor and deprived minorities of our society. For them compelled pooling of scant resources requires compelled sharing of a household.[5]

---

[4] See Report of the National Advisory Commission on Civil Disorders 278–281 (1968); Kosa & Nash, Social Ascent of Catholics, 8 Social Order 98–103 (1958); M. Novak, The Rise of the Unmeltable Ethnics 209–210 (1972); B. Yorburg, The Changing Family 106–109 (1973); Kosa, Rachiele, & Schommer, Sharing the Home with Relatives, 22 Marriage and Family Living 129 (1960).

[5] See, e. g., H. Gans, The Urban Villagers 45–73, 245–249 (1962).

"Perhaps the most important—or at least the most visible—difference between the classes is one of family structure. *The working class subculture* is distinguished by the dominant role of the family circle. . . .

"The specific characteristics of the family circle may differ widely— from the collateral peer group form of the West Enders, to the hierarchical type of the Irish, or to the classical three-generation extended family. . . . What matters most—and distinguishes this subculture from others—is that there be a family circle which is wider than the nuclear family, and that all of the opportunities, temptations, and pressures of the larger society be evaluated in terms of how they affect the ongoing way of life that has been built around this circle." *Id.*, at 244–245 (emphasis in original).

The "extended" form is especially familiar among black families.[6] We may suppose that this reflects the truism that black citizens, like generations of white immigrants before them, have been victims of economic and other disadvantages that would worsen if they were compelled to abandon extended, for nuclear, living patterns.[7] Even in husband and wife households, 13% of black families compared with 3% of white families include relatives under 18 years old, in addi-

---

[6] Yorburg, *supra*, n. 4, at 108. "Within the black lower-class it has been quite common for several generations, or parts of the kin, to live together under one roof. Often a maternal grandmother is the acknowledged head of this type of household which has given rise to the term 'matrifocal' to describe lower-class black family patterns." See J. Scanzoni, The Black Family in Modern Society 134 (1971); see also Anderson, The Pains and Pleasures of Old Black Folks, Ebony 123, 128–130 (Mar. 1973). See generally E. Frazier, The Negro Family in the United States (1939); Lewis, The Changing Negro Family, in E. Ginzberg, ed., The Nation's Children 108 (1960).

The extended family often plays an important role in the rearing of young black children whose parents must work. Many such children frequently "spend all of their growing-up years in the care of extended kin. . . . Often children are 'given' to their grandparents, who rear them to adulthood. . . . Many children normally grow up in a three-generation household and they absorb the influences of grandmother and grandfather as well as mother and father." J. Ladner, Tomorrow's Tomorrow: The Black Woman 60 (1972).

[7] The extended family has many strengths not shared by the nuclear family.

"The case histories behind mounting rates of delinquency, addiction, crime, neurotic disabilities, mental illness, and senility in societies in which autonomous nuclear families prevail suggest that frequent failure to develop enduring family ties is a serious inadequacy for both individuals and societies." D. Blitsten, The World of the Family 256 (1963).

Extended families provide services and emotional support not always found in the nuclear family:

"The troubles of the nuclear family in industrial societies, generally, and in American society, particularly, stem largely from the inability of this type of family structure to provide certain of the services performed in the past by the extended family. Adequate health, education, and

tion to the couple's own children.[8]  In black households whose head is an elderly woman, as in this case, the contrast is even more striking: 48% of such black households, compared with 10% of counterpart white households, include related minor children not offspring of the head of the household.[9]

I do not wish to be understood as implying that East Cleveland's enforcement of its ordinance is motivated by a racially discriminatory purpose: The record of this case would not support that implication.  But the prominence of other than nuclear families among ethnic and racial minority groups, including our black citizens, surely demonstrates that the "extended family" pattern remains a vital tenet of our society.[10]  It suffices that in prohibiting this pattern of family living as a means of achieving its objectives, appellee city has chosen a device that deeply intrudes into family associational rights that historically have been central, and today remain central, to a large proportion of our population.

Moreover, to sanction the drawing of the family line at the arbitrary boundary chosen by East Cleveland would surely conflict with prior decisions that protected "extended" family

---

welfare provision, particularly for the two nonproductive generations in modern societies, the young and the old, is increasingly an insurmountable problem for the nuclear family.  The unrelieved and sometimes unbearably intense parent-child relationship, where childrearing is not shared at least in part by others, and the loneliness of nuclear family units, increasingly turned in on themselves in contracted and relatively isolated settings, is another major problem."  Yorburg, *supra,* n. 4, at 194.

[8] R. Hill, The Strengths of Black Families 5 (1972).

[9] *Id.,* at 5–6.  It is estimated that at least 26% of black children live in other than husband-wife families, "including foster parents, the presence of other male or female relatives (grandfather or grandmother, older brother or sister, uncle or aunt), male or female nonrelatives, [or with] only *one* adult (usually mother) present . . . ."  Scanzoni, *supra,* n. 6, at 44.

[10] Novak, *supra,* n. 4; Hill, *supra,* at 5–6; N. Glazer & D. Moynihan, Beyond the Melting Pot 50–53 (2d ed. 1970); L. Rainwater & W. Yancey, The Moynihan Report and the Politics of Controversy 51–60 (1967).

relationships. For the "private realm of family life which the state cannot enter," recognized as protected in *Prince* v. *Massachusetts,* 321 U. S. 158, 166 (1944), was the relationship of aunt and niece. And in *Pierce* v. *Society of Sisters,* 268 U. S. 510, 534–535 (1925), the protection held to have been unconstitutionally abridged was "the liberty of parents and *guardians* to direct the upbringing and education of children under their control" (emphasis added). See also *Wisconsin* v. *Yoder,* 406 U. S. 205, 232–233 (1972). Indeed, *Village of Belle Terre* v. *Boraas,* 416 U. S. 1 (1974), the case primarily relied upon by the appellee, actually supports the Court's decision. The Belle Terre ordinance barred only unrelated individuals from constituting a family in a single-family zone. The village took special care in its brief to emphasize that its ordinance did not in any manner inhibit the choice of *related* individuals to constitute a family, whether in the "nuclear" or "extended" form. This was because the village perceived that choice as one it was constitutionally powerless to inhibit. Its brief stated: "Whether it be the extended family of a more leisurely age or the nuclear family of today the role of the family in raising and training successive generations of the species makes it more important, we dare say, than any other social or legal institution . . . . *If any freedom not specifically mentioned in the Bill of Rights enjoys a 'preferred position' in the law it is most certainly the family.*" (Emphasis supplied.) Brief for Appellants in No. 73–191, O. T. 1973, p. 26. The cited decisions recognized, as the plurality recognizes today, that the choice of the "extended family" pattern is within the "freedom of personal choice in matters of . . . family life [that] is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment." 414 U. S., at 639–640.

Any suggestion that the variance procedure of East Cleveland's Housing Code assumes special significance is without merit. This is not only because this grandmother

was not obligated to exhaust her administrative remedy before defending this prosecution on the ground that the single-family occupancy ordinance violates the Equal Protection Clause. *Euclid* v. *Ambler Realty Co.,* 272 U. S. 365 (1926), the leading case in the zoning field, expressly held that one attacking the constitutionality of a building or zoning code need not first seek a variance. *Id.,* at 386. Rather, the matter of a variance is irrelevant also because the municipality is constitutionally powerless to abridge, as East Cleveland has done, the freedom of personal choice of related members of a family to live together. Thus, the existence of the variance procedure serves to lessen neither the irrationality of the definition of "family" nor the extent of its intrusion into family life-style decisions.

There is no basis for an inference—other than the city's self-serving statement that a hardship variance "possibly with some stipulation(s) would probably have been granted"—that this grandmother would have obtained a variance had she requested one. Indeed, a contrary inference is more supportable. In deciding to prosecute her in the first place, the city tipped its hand how discretion would have been exercised. In any event, § 1311.02 (1965), limits the discretion of the Board of Building Code Appeals to grant variances to those which are "in harmony with the general intent of such ordinance . . . ." If one of the legitimate objectives of the definition of "family" was to preserve the single (nuclear) family character of East Cleveland, then granting this grandmother a variance would be in excess of the Board's powers under the ordinance.

. Furthermore, the very existence of the "escape hatch" of the variance procedure only heightens the irrationality of the restrictive definition, since application of the ordinance then depends upon which family units the zoning authorities permit to reside together and whom the prosecuting authorities choose to prosecute. The Court's disposition of the analogous situation in *Roe* v. *Wade,* 410 U. S. 113 (1973),

is instructive. There Texas argued that, despite a rigid and narrow statute prohibiting abortions except for the purpose of saving the mother's life, prosecuting authorities routinely tolerated elective abortion procedures in certain cases, such as nonconsensual pregnancies resulting from rape or incest. The Court was not persuaded that this saved the statute, THE CHIEF JUSTICE commenting that "no one in these circumstances should be placed in a posture of dependence on a prosecutorial policy or prosecutorial discretion." *Id.*, at 208 (concurring opinion). Similarly, this grandmother cannot be denied the opportunity to defend against this criminal prosecution because of a variance procedure that holds her family hostage to the vagaries of discretionary administrative decisions. *Smith* v. *Cahoon,* 283 U. S. 553, 562 (1931). We have now passed well beyond the day when illusory escape hatches could justify the imposition of burdens on fundamental rights. *Stanley* v. *Illinois,* 405 U. S. 645, 647–649 (1972); *Staub* v. *City of Baxley,* 355 U. S. 313, 319 (1958).

MR. JUSTICE STEVENS, concurring in the judgment.

In my judgment the critical question presented by this case is whether East Cleveland's housing ordinance is a permissible restriction on appellant's right to use her own property as she sees fit.

Long before the original States adopted the Constitution, the common law protected an owner's right to decide how best to use his own property. This basic right has always been limited by the law of nuisance which proscribes uses that impair the enjoyment of other property in the vicinity. But the question whether an individual owner's use could be further limited by a municipality's comprehensive zoning plan was not finally decided until this century.

The holding in *Euclid* v. *Ambler Realty Co.,* 272 U. S. 365, that a city could use its police power, not just to abate a specific use of property which proved offensive, but also to create and implement a comprehensive plan for the use

of land in the community, vastly diminished the rights of individual property owners. It did not, however, totally extinguish those rights. On the contrary, that case expressly recognized that the broad zoning power must be exercised within constitutional limits.

In his opinion for the Court, Mr. Justice Sutherland fused the two express constitutional restrictions on any state interference with private property—that property shall not be taken without due process nor for a public purpose without just compensation—into a single standard: "[B]efore [a zoning] ordinance can be declared unconstitutional, [it must be shown to be] clearly arbitrary and unreasonable, *having no substantial relation to the public health, safety, morals, or general welfare." Id.,* at 395 (emphasis added). This principle was applied in *Nectow* v. *Cambridge,* 277 U. S. 183; on the basis of a specific finding made by the state trial court that "the health, safety, convenience and general welfare of the inhabitants of the part of the city affected" would not be promoted by prohibiting the landowner's contemplated use, this Court held that the zoning ordinance as applied was unconstitutional. *Id.,* at 188.[1]

With one minor exception,[2] between the *Nectow* decision in 1928 and the 1974 decision in *Village of Belle Terre* v. *Boraas,* 416 U. S. 1, this Court did not review the substance of any zoning ordinances. The case-by-case development of the constitutional limits on the zoning power has not, therefore, taken place in this Court. On the other hand, during

---

[1] The Court cited *Zahn* v. *Board of Public Works,* 274 U. S. 325. The statement of the rule in *Zahn* remains viable today:

"The most that can be said [of this zoning ordinance] is that whether that determination was an unreasonable, arbitrary or unequal exercise of power is fairly debatable. In such circumstances, the settled rule of this court is that it will not substitute its judgment for that of the legislative body charged with the primary duty and responsibility of determining the question." *Id.,* at 328.

[2] *Goldblatt* v. *Town of Hempstead,* 369 U. S. 590.

the past half century the broad formulations found in *Euclid* and *Nectow* have been applied in countless situations by the state courts. Those cases shed a revelatory light on the character of the single-family zoning ordinance challenged in this case.

Litigation involving single-family zoning ordinances is common. Although there appear to be almost endless differences in the language used in these ordinances,[3] they contain three principal types of restrictions. First, they define the kind of structure that may be erected on vacant land.[4] Second, they require that a single-family home be occupied only by a "single housekeeping unit."[5] Third, they often

---

[3] See, for example, the various provisions quoted or paraphrased in *Brady* v. *Superior Court*, 200 Cal. App. 2d 69, 80–81, n. 3, 19 Cal. Rptr. 242, 249 n. 3 (1962).

[4] As this Court recognized in *Euclid*, even residential apartments can have a negative impact on an area of single-family homes.

"[O]ften the apartment house is a mere parasite, constructed in order to take advantage of the open spaces and attractive surroundings created by [a single-family dwelling area] . . . . [T]he coming of one apartment house is followed by others, interfering by their height and bulk with the free circulation of air and monopolizing the rays of the sun which otherwise would fall upon the smaller homes, and bringing, as their necessary accompaniments, the disturbing noises incident to increased traffic and business, and the occupation, by means of moving and parked automobiles, of larger portions of the streets, thus detracting from their safety and depriving children of the privilege of quiet and open spaces for play, enjoyed by those in more favored localities,—until, finally, the residential character of the neighborhood and its desirability as a place of detached residences are utterly destroyed. Under these circumstances, apartment houses, which in a different environment would be not only entirely unobjectionable but highly desirable, come very near to being nuisances." 272 U. S., at 394–395.

[5] Limiting use to single-housekeeping units, like limitations on the number of occupants, protects the community's interest in minimizing overcrowding, avoiding the excessive use of municipal services, traffic control, and other aspects of an attractive physical environment. See *Village of Belle Terre* v. *Boraas*, 416 U. S. 1, 9.

require that the housekeeping unit be made up of persons related by blood, adoption, or marriage, with certain limited exceptions.

Although the legitimacy of the first two types of restrictions is well settled,[6] attempts to limit occupancy to related persons have not been successful. The state courts have recognized a valid community interest in preserving the stable character of residential neighborhoods which justifies a prohibition against transient occupancy.[7] Nevertheless, in well-reasoned opinions, the courts of Illinois,[8] New York,[9] New Jersey,[10]

---

[6] See nn. 4 and 5, *supra,* and also Professor N. Williams' discussion of the subject in his excellent treatise on zoning law, 2 American Land Planning Law 349–361 (1974).

[7] Types of group living which have not fared well under single-family ordinances include fraternities, *Schenectady* v. *Alumni Assn.,* 5 App. Div. 2d 14, 168 N. Y. S. 2d 754 (1957); sororities, *Cassidy* v. *Triebel,* 337 Ill. App. 117, 85 N. E. 2d 461 (1948); a retirement home designed for over 20 people, *Kellog* v. *Joint Council of Women's Auxiliaries Welfare Assn.,* 265 S. W. 2d 374 (Mo. 1954); and a commercial therapeutic home for emotionally disturbed children, *Browndale International* v. *Board of Adjustment,* 60 Wis. 2d 182, 208 N. W. 2d 121 (1973). These institutional uses are not only inconsistent with the single-housekeeping-unit concept but include many more people than would normally inhabit a single-family dwelling.

[8] In *City of Des Plaines* v. *Trottner,* 34 Ill. 2d 432, 216 N. E. 2d 116 (1966), the Illinois Supreme Court faced a challenge to a single-family zoning ordinance by a group of four unrelated young men who occupied a dwelling in violation of the ordinance which provided that a " 'family' consists of one or more persons each related to the other by blood (or adoption or marriage) . . . ." *Id.,* at 433, 216 N. E. 2d, at 117. In his opinion for the court, Justice Schaefer wrote:

"When other courts have been called upon to define the term 'family' they have emphasized the single housekeeping unit aspect of the term, rather than the relationship of the occupants. [Citing cases.]

"In terms of permissible zoning objectives, a group of persons bound together only by their common desire to operate a single housekeeping

California,[11] Connecticut,[12] Wisconsin,[13] and other jurisdictions,[14] have permitted unrelated persons to occupy single-family residences notwithstanding an ordinance prohibiting, either expressly or implicitly, such occupancy.

unit, might be thought to have a transient quality that would affect adversely the stability of the neighborhood, and so depreciate the value of other property. An ordinance requiring relationship by blood, marriage or adoption could be regarded as tending to limit the intensity of land use. And it might be considered that a group of unrelated persons would be more likely to generate traffic and parking problems than would an equal number of related persons.

"But none of these observations reflects a universal truth. Family groups are mobile today, and not all family units are internally stable and well-disciplined. Family groups with two or more cars are not unfamiliar. And so far as intensity of use is concerned, the definition in the present ordinance, with its reference to the 'respective spouses' of persons related by blood, marriage or adoption, can hardly be regarded as an effective control upon the size of family units.

"The General Assembly has not specifically authorized the adoption of zoning ordinances that penetrate so deeply as this one does into the internal composition of a single housekeeping unit. Until it has done so, we are of the opinion that we should not read the .general authority that it has delegated to extend so far." *Id.,* at 436–438, 216 N. E. 2d, at 119–120.

[9] In *White Plains* v. *Ferraioli,* 34 N. Y. 2d 300, 313 N. E. 2d 756 (1974), the Court of Appeals of New York refused to apply an ordinance limiting occupancy of single-family dwellings to related individuals to a "group home" licensed by the State to care for abandoned and neglected children. The court wrote:

"Zoning is intended to control types of housing and living and not the genetic or intimate internal family relations of human beings.

"Whether a family be organized along ties of blood or formal adoptions, or be a similarly structured group sponsored by the State, as is the group home, should not be consequential in meeting the test of the zoning ordinance. So long as the group home bears the generic character of a family unit as a relatively permanent household, and is not a framework for transients or transient living, it conforms to the purpose of the ordinance . . . ." *Id.,* at 305–306, 313 N. E. 2d, at 758.

[10] In *Kirsch Holding Co.* v. *Borough of Manasquan,* 59 N. J. 241, 252,

These cases delineate the extent to which the state courts have allowed zoning ordinances to interfere with the right of a property owner to determine the internal composition of his

---

281 A. 2d 513, 518 (1971), the Supreme Court of New Jersey reviewed a complex single-family zoning ordinance designed to meet what the court recognized to be a pressing community problem. The community, a seaside resort, had been inundated during recent summers by unruly groups of summer visitors renting seaside cottages. To solve the problems of excessive noise, overcrowding, intoxication, wild parties, and immorality that resulted from these group rentals, the community passed a zoning ordinance which prohibited seasonal rentals of cottages by most groups other than "families" related by blood or marriage. The court found that even though the problems were severe, the ordinance "preclude[d] so many harmless dwelling uses" that it became "sweepingly excessive, and therefore legally unreasonable." *Ibid.* The court quoted, *id.*, at 252, 281 A. 2d, at 519, the following language from *Gabe Collins Realty, Inc.* v. *Margate City,* 112 N. J. Super. 341, 349, 271 A. 2d 430, 434 (1970), in a similar case as "equally applicable here":

"Thus, even in the light of the legitimate concern of the municipality with the undesirable concomitants of group rentals experienced in Margate City, and of the presumption of validity of municipal ordinances, we are satisfied that the remedy here adopted constitutes a sweepingly excessive restriction of property rights as against the problem sought to be dealt with, and in legal contemplation deprives plaintiffs of their property without due process."

The court in *Kirsch Holding Co., supra,* at 251 n. 6, 281 A. 2d., at 518 n. 6, also quoted with approval the following statement from *Marino* v. *Mayor & Council of Norwood,* 77 N. J. Super. 587, 594, 187 A. 2d 217, 221 (1963):

"Until compelled to do so by a New Jersey precedent squarely in point, this court will not conclude that persons who have economic or other personal reasons for living together as a *bona fide* single housekeeping unit and who have no other orientation, commit a zoning violation, with possible penal consequences, just because they are not related."

[11] A California appellate court in *Brady* v. *Superior Court,* 200 Cal. App. 2d, at 81, 19 Cal. Rptr., at 250, allowed use of a single-family dwelling by two unrelated students, noting:

"The erection or construction of a 'single family dwelling,' in itself, would imply that any building so constructed would contain a central

household. The intrusion on that basic property right has not previously gone beyond the point where the ordinance defines a family to include only persons related by blood, marriage, or adoption. Indeed, as the cases in the margin demonstrate, state courts have not always allowed the intrusion to penetrate that far. The state decisions have upheld zoning ordinances which regulated the identity, as opposed to the number, of persons who may compose a household only to the extent that the ordinances require such households to remain nontransient, single-housekeeping units.[15]

kitchen, dining room, living room, bedrooms; that is, constitute a single housekeeping unit. Consequently, to qualify as a 'single family dwelling' an erected structure need only be used as a single housekeeping unit."

[12] The Supreme Court of Connecticut allowed occupancy of a large summer home by four related families because the families did "not occupy separate quarters within the house, [but used] the lodging, cooking and eating facilities [as] common to all." *Neptune Park Assn.* v. *Steinberg,* 138 Conn. 357, 360, 84 A. 2d 687, 689 (1951).

[13] The Supreme Court of Wisconsin, noting that "the letter killeth but the spirit giveth life," 2 Corinthians 3:6, held that six priests and two lay brothers constituted a "family" and that their use, for purely residential purposes of a single-family dwelling did not violate a single-family zoning ordinance. *Missionaries of Our Lady of LaSalette* v. *Whitefish Bay,* 267 Wis. 609, 66 N. W. 2d 627 (1954).

[14] *Carroll* v. *Miami Beach,* 198 So. 2d 643 (Fla. App. 1967); *Robertson* v. *Western Baptist Hospital,* 267 S. W. 2d 395 (Ky. App. 1954); *Women's Kansas City St. Andrew Soc.* v. *Kansas City,* 58 F. 2d 593 (CA8 1932); *University Heights* v. *Cleveland Jewish Orphans' Home,* 20 F. 2d 743 (CA6 1927).

[15] *Village of Belle Terre* v. *Boraas,* 416 U. S. 1, is consistent with this line of state authority. Chief Judge Breitel in *White Plains* v. *Ferraioli, supra,* at 304–305, 313 N. E. 2d, at 758, cogently characterized the *Belle Terre* decision upholding a single-family ordinance as one primarily concerned with the prevention of transiency in a small, quiet suburban community. He wrote:

"The group home [in *White Plains*] is not, for purposes of a zoning ordinance, a temporary living arrangement as would be a group of college students sharing a house and commuting to a nearby school (cf. *Village of*

There appears to be no precedent for an ordinance which excludes any of an owner's relatives from the group of persons who may occupy his residence on a permanent basis. Nor does there appear to be any justification for such a restriction on an owner's use of his property.[16] The city has failed totally to explain the need for a rule which would allow a homeowner to have two grandchildren live with her if they are brothers, but not if they are cousins. Since this ordinance has not been shown to have any "substantial relation to the public health, safety, morals, or general welfare" of the city of East Cleveland, and since it cuts so deeply into a fundamental right normally associated with the ownership of residential property—that of an owner to decide who may reside on his or her property—it must fall under the limited standard of review of zoning decisions which this Court preserved in

---

*Belle Terre* v. *Boraas* . . .). Every year or so, different college students would come to take the place of those before them. There would be none of the permanency of community that characterizes a residential neighborhood of private homes."

[16] Of course, a community has other legitimate concerns in zoning an area for single-family use including prevention of overcrowding in residences and prevention of traffic congestion. A community which attacks these problems by restricting the composition of a household is using a means not reasonably related to the ends it seeks to achieve. See *Des Plaines* v. *Trottner*, 34 Ill. 2d, at 435–436, 216 N. E. 2d, at 118. To prevent overcrowding, a community can certainly place a limit on the number of occupants in a household, either in absolute terms or in relation to the available floor space. Indeed, the city of East Cleveland had on its books an ordinance requiring a minimum amount of floor space per occupant in every dwelling. See *Nolden* v. *East Cleveland City Comm'n*, 12 Ohio Misc. 205, 232 N. E. 2d 421 (Com. Pl. Ct., Cuyahoga Cty. 1966). Similarly, traffic congestion can be reduced by prohibiting on-street parking. To attack these problems through use of a restrictive definition of family is, as one court noted, like "burn[ing] the house to roast the pig." *Larson* v. *Mayor*, 99 N. J. Super. 365, 374, 240 A. 2d 31, 36 (1968). More narrowly, a limitation on *which* of the owner's grandchildren may reside with her obviously has no relevance to these problems.

*Euclid* and *Nectow*. Under that standard, East Cleveland's unprecedented ordinance constitutes a taking of property without due process and without just compensation.

For these reasons, I concur in the Court's judgment.

MR. CHIEF JUSTICE BURGER, dissenting.

It is unnecessary for me to reach the difficult constitutional issue this case presents. Appellant's deliberate refusal to use a plainly adequate administrative remedy provided by the city should foreclose her from pressing in this Court any constitutional objections to the city's zoning ordinance. Considerations of federalism and comity, as well as the finite capacity of federal courts, support this position. In courts, as in hospitals, two bodies cannot occupy the same space at the same time; when any case comes here which could have been disposed of long ago at the local level, it takes the place that might well have been given to some other case in which there was no alternative remedy.

(1)

The single-family zoning ordinances of the city of East Cleveland define the term "family" to include only the head of the household and his or her most intimate relatives, principally the spouse and unmarried and dependent children. Excluded from the definition of "family," and hence from cohabitation, are various persons related by blood or adoption to the head of the household. The obvious purpose of the city is the traditional one of preserving certain areas as family residential communities.

The city has established a Board of Building Code Appeals to consider variances from this facially stringent single-family limit when necessary to alleviate "practical difficulties and unnecessary hardships" and "to secure the general welfare and [do] substantial justice . . . ." East Cleveland Codified Ordinances § 1311.02 (1965). The Board has power to grant variances to "[a]ny person adversely affected by a decision of

522

any City official made in the enforcement of any [zoning] ordinance," so long as appeal is made to the Board within 10 days of notice of the decision appealed from. § 1311.03.

After appellant's receipt of the notice of violation, her lawyers made no effort to apply to the Board for a variance to exempt her from the restrictions of the ordinance, even though her situation appears on its face to present precisely the kind of "practical difficulties and unnecessary hardships" the variance procedure was intended to accommodate. Appellant's counsel does not claim appellant was unaware of the right to go to the Board and seek a variance, or that any attempt was made to secure relief by an application to the Board.[1] Indeed, appellant's counsel makes no claim that the failure to seek a variance was due to anything other than a deliberate decision to forgo the administrative process in favor of a judicial forum.

### (2)

In view of appellant's deliberate bypass of the variance procedure, the question arises whether she should now be permitted to complain of the unconstitutionality of the single-family ordinance as it applies to her. This Court has not yet required one in appellant's position to utilize available state administrative remedies as a prerequisite to obtaining federal relief; but experience has demonstrated that such a requirement is imperative if the critical overburdening of federal courts at all levels is to be alleviated. That burden has now become "a crisis of overload, a crisis so serious that it threatens the capacity of the federal system to function as it should."

---

[1] Counsel for appellant candidly admitted at oral argument that "Mrs. Moore did not seek a variance in this case" but argued that her failure to do so is constitutionally irrelevant. Tr. of Oral Arg. 20. Thus, this was not an unpublicized administrative remedy of which appellant remained unaware until after it became unavailable. Such a case would, of course, present materially different considerations. Cf. *Lambert* v. *California,* 355 U. S. 225 (1957).

Department of Justice Committee on Revision of the Federal Judicial System, Report on the Needs of the Federal Courts 1 (1977). The same committee went on to describe the disastrous effects an exploding caseload has had on the administration of justice:

"Overloaded courts . . . mean long delays in obtaining a final decision and additional expense as court procedures become more complex in the effort to handle the rush of business. . . . [T]he quality of justice must necessarily suffer. Overloaded courts, seeking to deliver justice on time insofar as they can, necessarily begin to adjust their processes, sometimes in ways that threaten the integrity of the law and of the decisional process.

"District courts have delegated more and more of their tasks to magistrates . . . . Time for oral argument is steadily cut back . . . . [T]he practice of delivering written opinions is declining.

. . . . .

". . . Courts are forced to add more clerks, more administrative personnel, to move cases faster and faster. They are losing . . . time for reflection, time for the deliberate maturation of principles." *Id.*, at 3–4.

The devastating impact overcrowded dockets have on the quality of justice received by all litigants makes it essential that courts be reserved for the resolution of disputes for which no other adequate forum is available.

## A

The basis of the doctrine of exhaustion of administrative remedies was simply put in *Myers* v. *Bethlehem Shipbuilding Corp.*, 303 U. S. 41, 50–51 (1938), as

"the long settled rule of judicial administration that no one is entitled to judicial relief for a supposed or

> threatened injury until the prescribed administrative remedy has been exhausted."

Exhaustion is simply one aspect of allocation of overtaxed judicial resources. Appellant wishes to use a residential property in a manner at variance with a municipal housing code. That claim could have been swiftly and inexpensively adjudicated in a municipal administrative tribunal, without engaging cumbersome federal judicial machinery at the highest level. Of course, had appellant utilized the local administrative remedies and state judicial remedies to no avail, resort to this Court would have been available.[2]

The exhaustion principle asks simply that absent compelling circumstances—and none are claimed here—the avenues of relief nearest and simplest should be pursued first. This Court should now make unmistakably clear that when state or local governments provide administrative remedial procedures, no federal forum will be open unless the claimant can show either that the remedy is inadequate or that resort to those remedies is futile.

Utilization of available administrative processes is mandated for a complex of reasons. Statutes sometimes provide administrative procedures as the exclusive remedy. Even apart from a statutory command, it is common sense to permit the simple, speedy, and inexpensive processes of the administrative machinery to sift the facts and compile a complete record for the benefit of any reviewing courts. Exhaustion avoids interruption of the administrative process and allows application of an agency's specialized experience and the broad discretion granted to local entities, such as zoning boards.

---

[2] Exhaustion does not deny or limit litigants' rights to a federal forum "because state administrative agency determinations do not create res judicata or collateral estoppel effects. The exhaustion of state administrative remedies postpones rather than precludes the assertion of federal jurisdiction." Comment, Exhaustion of State Administrative Remedies in Section 1983 Cases, 41 U. Chi. L. Rev. 537, 551 (1974).

Indeed, judicial review may be seriously hampered if the appropriate agency has no chance to apply its experience, exercise its discretion, or make a factual record reflecting all aspects of the problem.

Most important, if administrative remedies are pursued, the citizen may win complete relief without needlessly invoking judicial process. This permits the parties to resolve their disputes by relatively informal means far less costly and time consuming than litigation. By requiring exhaustion of administrative processes the courts are assured of reviewing only final agency decisions arrived at after considered judgment. It also permits agencies an opportunity to correct their own mistakes or give discretionary relief short of judicial review. Consistent failure by courts to mandate utilization of administrative remedies—under the growing insistence of lawyers demanding broad judicial remedies—inevitably undermines administrative effectiveness and defeats fundamental public policy by encouraging "end runs" around the administrative process.

It is apparent without discussion that resort to the local appeals board in this case would have furthered these policies, particularly since the exercise of informed discretion and experience by the proper agency is the essence of any housing code variance procedure. We ought not to encourage litigants to bypass simple, inexpensive, and expeditious remedies available at their doorstep in order to invoke expensive judicial machinery on matters capable of being resolved at local levels.

## B

The suggestion is made that exhaustion of administrative remedies is not required on issues of constitutional law. In one sense this argument is correct, since administrative agencies have no power to decide questions of federal constitutional law. But no one has a right to a federal constitutional ad-

judication on an issue capable of being resolved on a less elevated plane. Indeed, few concepts have had more faithful adherence in this Court than the imperative of avoiding constitutional resolution of issues capable of being disposed of otherwise. Mr. Justice Brandeis put it well in a related context, arguing for judicial restraint in *Ashwander* v. *TVA*, 297 U. S. 288, 347 (1936) (concurring opinion):

> "[This] Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of. . . . Thus, if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter."

This Court has frequently remanded cases for exhaustion "before a challenge can be made in a reviewing court of the constitutionality of the basic statute, on which the agency may not pass . . . ." K. Davis, Administrative Law Text 394 (3d ed. 1972). Indeed, exhaustion is often required precisely *because* there are constitutional issues present in a case, in order to avoid unnecessary adjudication of these delicate questions by giving the affected administrative agency an opportunity to resolve the matter on nonconstitutional grounds. See *Christian* v. *New York Dept. of Labor,* 414 U. S. 614 (1974); *Public Utilities Comm'n of California* v. *United States,* 355 U. S. 534, 539–540 (1958); *Allen* v. *Grand Central Aircraft Co.,* 347 U. S. 535, 553 (1954); *Aircraft & Diesel Equipment Corp.* v. *Hirsch,* 331 U. S. 752, 766–767 (1947); *Natural Gas Co.* v. *Slattery,* 302 U. S. 300, 309–311 (1937); Fuchs, Prerequisites to Judicial Review of Administrative Agency Action, 51 Ind. L. J. 817, 883 (1976).

Of course, if administrative authority fails to afford relief, further exhaustion is pointless and judicial relief may be available. See *Weinberger* v. *Salfi,* 422 U. S. 749 (1975).

But so long as favorable administrative action is still possible, the policies favoring exhaustion are not mitigated in the slightest by the presence of a constitutional issue. See *Christian, supra*. To the extent that a nonconstitutional decision is possible only at the administrative level, those policies are reinforced. Plainly we have here precisely such a case. Appearance before the local city Board would have provided an opportunity for complete relief without forcing a constitutional ruling. The posture of the constitutional issues in this case thus provides an additional reason supporting the exhaustion requirement.

## C

It is also said that exhaustion is not required when to do so would inflict irreparable injury on the litigant. In the present case, as in others in which a constitutional claim is asserted, injury is likely to include the "loss or destruction of substantive rights." In such a case, "the presence of constitutional questions, coupled with a sufficient showing of inadequacy of prescribed administrative relief and of threatened or impending irreparable injury flowing from delay . . . , has been held sufficient to dispense with exhausting the administrative process before instituting judicial intervention." *Aircraft & Diesel Equipment Corp., supra*, at 773.

But there is every reason to require resort to administrative remedies "where the individual charged is to be deprived of nothing until the completion of [the administrative] proceeding." *Gibson* v. *Berryhill*, 411 U. S. 564, 574–575 (1973); see *Natural Gas Co., supra*, at 309–311; *Schlesinger* v. *Councilman*, 420 U. S. 738 (1975); *Aircraft & Diesel Equipment Corp., supra*, at 773–774. The focus must be on the adequacy of the administrative remedy. If the desired relief may be obtained without undue burdens, and if substantial rights are protected as the process moves forward, no harm is done by requiring the litigant to pursue and exhaust those remedies before calling on the Constitution of

the United States. To do otherwise trivializes constitutional adjudication.[3]

In this case appellant need have surrendered no asserted constitutional rights in order to pursue the local administrative remedy. No reason appears why appellant could not have sought a variance as soon as notice of a claimed violation was received, without altering the living arrangements in question. The notice of violation gave appellant 10 days within which to seek a variance; no criminal or civil sanctions could possibly have attached pending the outcome of that proceeding.

Though timely invocation of the administrative remedy would have had no effect on appellant's asserted rights, and would have inflicted no irreparable injury, the present availability of such relief under the city ordinance is less clear. But it is unrealistic to expect a municipality to hold open its administrative process for years after legal enforcement action has begun. Appellant cannot rely on the current absence

---

[3] This analysis explains those cases in which this Court has allowed persons subject to claimed unconstitutional restrictions on their freedom of expression to challenge that restriction without first applying for a permit which, if granted, would moot their claim. *E. g., Hynes* v. *Mayor of Oradell,* 425 U. S. 610 (1976); *Shuttlesworth* v. *Birmingham,* 394 U. S. 147 (1969); *Staub* v. *City of Baxley,* 355 U. S. 313 (1958). In each instance the permit procedure was itself an unconstitutional infringement on First Amendment rights. Thus, in those cases irreparable injury—the loss or postponement of precious First Amendment rights—was a concomitant of the available administrative procedure.

Similarly explicable are those cases in which challenge is made to the constitutionality of the administrative proceedings themselves. See *Freedman* v. *Maryland,* 380 U. S. 51 (1965); *Public Utilities Comm'n of California* v. *United States,* 355 U. S. 534, 540 (1958). But see *Christian* v. *New York Dept. of Labor,* 414 U. S. 614, 622 (1974), where appellants' constitutional due process challenge to administrative procedures was deferred pending agency action. Exhaustion in those situations would similarly risk infringement of a constitutional right by the administrative process itself.

of administrative relief either as justification for the original failure to seek it, or as a reason why accountability for that failure is unreasonable. See *Huffman* v. *Pursue, Ltd.*, 420 U. S. 592, 611 n. 22 (1975). Any other rule would make a mockery of the exhaustion doctrine by placing no penalty on its violation.

## D

This is not a case where inadequate or unclear or costly remedies make exhaustion inappropriate, or where the Board's position relating to appellant's claims is so fixed that further administrative review would be fruitless. There is not the slightest indication of any fixed Board policy against variances, or that a prompt application for a variance would not have been granted.[4] Nor is it dispositive that the case involves criminal rather than civil penalties. The applicability of the exhaustion principle to bar challenges to the legality of prosecutions is established, even where, unlike the present case, substantial felony penalties are at stake. *McGee* v. *United States*, 402 U. S. 479 (1971); *Yakus* v. *United States*, 321 U. S. 414 (1944); *Falbo* v. *United States*, 320 U. S. 549 (1944); see *McKart* v. *United States*, 395 U. S. 185 (1969). There is far less reason to take into account the criminal nature of the proceedings when only misdemeanor penalties are involved.

## (3)

Thus, the traditional justifications offered in support of the exhaustion principle point toward application of the doctrine. But there is a powerful additional reason why exhaustion should be enforced in this case. We deal here with federal

---

[4] To be adequate for exhaustion purposes, an administrative remedy need not guarantee the litigant success on the merits in advance. What is required is a forum with the power to grant relief, capable of hearing the case with objectivity and dispatch. There is no reason to doubt that appellant would have received a fair hearing before the Board.

judicial review of an administrative determination by a subdivision of the State of Ohio. When the question before a federal court is whether to enforce exhaustion of state administrative remedies, interests of federalism and comity make the analysis strikingly similar to that appropriate when the question is whether federal courts should abstain from interference with ongoing state judicial proceedings.[5] In both situations federal courts are being requested to act in ways lacking deference to, and perhaps harmful to, important state interests in order to vindicate rights which can be protected in the state system as well as in the federal. Cf. *Wisconsin* v. *Constantineau,* 400 U. S. 433, 439 (1971) (BURGER, C. J., dissenting). The policies underlying this Court's refusals to jeopardize important state objectives needlessly in *Huffman* v. *Pursue, Ltd., supra; Juidice* v. *Vail,* 430 U. S. 327 (1977); and *Trainor* v. *Hernandez, ante,* p. 434, argue strongly against action which encourages evasion and undermining of other important state interests embodied in regulatory procedures.

When the State asserts its sovereignty through the administrative process, no less than when it proceeds judicially, "federal courts . . . should abide by standards of restraint that go well beyond those of private equity jurisprudence." *Huffman, supra,* at 603; cf. *Younger* v. *Harris,* 401 U. S. 37, 41 (1971). A proper respect for state integrity is manifested by and, in part, dependent on, our reluctance to disrupt state

---

[5] See *Parisi* v. *Davidson,* 405 U. S. 34, 37, 40 n. 6 (1972); *Public Utilities Comm'n* v. *United Fuel Co.,* 317 U. S. 456 (1943); *Natural Gas Co.* v. *Slattery,* 302 U. S. 300, 311 (1937); *Prentis* v. *Atlantic Coast Line,* 211 U. S. 210, 229 (1908); *First Nat. Bank* v. *Board of County Comm'rs,* 264 U. S. 450 (1924); cf. *Schlesinger* v. *Councilman,* 420 U. S. 738, 756–757 (1975). See generally L. Jaffe, Judicial Control of Administrative Action 437–438 (1965); Fuchs, Prerequisites to Judicial Review of Administrative Agency Action, 51 Ind. L. J. 817, 861–862 (1976); Comment, Exhaustion of State Administrative Remedies Under the Civil Rights Act, 8 Ind. L. Rev. 565 (1975).

proceedings even when important federal rights are asserted as a reason for doing so. Where, as here, state law affords an appropriate "doorstep" vehicle for vindication of the claims underlying those rights, federal courts should not be called upon unless those remedies have been utilized. No litigant has a right to force a constitutional adjudication by eschewing the only forum in which adequate nonconstitutional relief is possible. Appellant seeks to invoke federal judicial relief. We should now make clear that the finite resources of this Court are not available unless the litigant has first pursued all adequate and available administrative remedies.

The doctrine of exhaustion of administrative remedies has a long history. Though its salutary effects are undisputed, they have often been casually neglected, due to the judicial penchant of honoring the doctrine more in the breach than in the observance. For my part, the time has come to insist on enforcement of the doctrine whenever the local or state remedy is adequate and where asserted rights can be protected and irreparable injury avoided within the administrative process. Only by so doing will this Court and other federal courts be available to deal with the myriad new problems clamoring for resolution.

MR. JUSTICE STEWART, with whom MR. JUSTICE REHNQUIST joins, dissenting.

In *Village of Belle Terre* v. *Boraas*, 416 U. S. 1, the Court considered a New York village ordinance that restricted land use within the village to single-family dwellings. That ordinance defined "family" to include all persons related by blood, adoption, or marriage who lived and cooked together as a single-housekeeping unit; it forbade occupancy by any group of three or more persons who were not so related. We held that the ordinance was a valid effort by the village government to promote the general community welfare, and that it did not violate the Fourteenth Amendment or in-

fringe any other rights or freedoms protected by the Constitution.

The present case brings before us a similar ordinance of East Cleveland, Ohio, one that also limits the occupancy of any dwelling unit to a single family, but that defines "family" to include only certain combinations of blood relatives. The question presented, as I view it, is whether the decision in *Belle Terre* is controlling, or whether the Constitution compels a different result because East Cleveland's definition of "family" is more restrictive than that before us in the *Belle Terre* case.

The city of East Cleveland is a residential suburb of Cleveland, Ohio. It has enacted a comprehensive Housing Code, one section of which prescribes that "[t]he occupancy of any dwelling unit shall be limited to one, and only one, family . . . ." [1] The Code defines the term "family" as follows:

> " 'Family' means a number of individuals related to the nominal head of the household or to the spouse of the nominal head of the household living as a single housekeeping unit in a single dwelling unit, but limited to the following:
>
> "(a) Husband or wife of the nominal head of the household.
>
> "(b) Unmarried children of the nominal head of the household or of the spouse of the nominal head of the household, provided, however, that such unmarried children have no children residing with them.
>
> "(c) Father or mother of the nominal head of the household or of the spouse of the nominal head of the household.
>
> "(d) Notwithstanding the provisions of subsection (b) hereof, a family may include not more than one dependent married or unmarried child of the nominal head of the household or of the spouse of the nominal head of

---

[1] East Cleveland Housing Code § 1351.02 (1964).

the household and the spouse and dependent children of such dependent child. For the purpose of this subsection, a dependent person is one who has more than fifty percent of his total support furnished for him by the nominal head of the household and the spouse of the nominal head of the household.

"(e) A family may consist of one individual." [2]

The appellant, Inez Moore, owns a 2½-story frame house in East Cleveland. The building contains two "dwelling units." [3] At the time this litigation began Mrs. Moore occupied one of these dwelling units with her two sons, John Moore, Sr., and Dale Moore, Sr., and their two sons, John, Jr., and Dale, Jr. [4] These five persons constituted more than one family under the ordinance.

In January 1973, a city housing inspector cited Mrs. Moore for occupation of the premises by more than one family. [5] She received a notice of violation directing her to

---

[2] East Cleveland Housing Code § 1341.08 (1966).

[3] The Housing Code defines a "dwelling unit" as "a group of rooms arranged, maintained or designed to be occupied by a single family and consisting of a complete bathroom with toilet, lavatory and tub or shower facilities; one, and one only, complete kitchen or kitchenette with approved cooking, refrigeration and sink facilities; approved living and sleeping facilities. All of such facilities shall be in contiguous rooms and used exclusively by such family and by any authorized persons occupying such dwelling unit with the family." § 1341.07.

[4] There is some suggestion in the record that the other dwelling unit in the appellant's house was also occupied by relatives of Mrs. Moore. A notice of violation dated January 16, 1973, refers to "Ms. Carol Moore and her son, Derik," as illegal occupants in the other unit, and at some point the illegal occupancy in one of the units allegedly was corrected by transferring one occupant over to the other unit.

[5] Mrs. Moore, as the owner of the house, was responsible for compliance with the Housing Code. East Cleveland Housing Code § 1343.04 (1966). The illegal occupant, however, was identified by the city as John Moore, Jr., Mrs. Moore's grandson. The record suggests no reason why he was named, rather than Dale Moore, Jr. The occupancy might have been

correct the situation, which she did not do. Sixteen months passed, during which the city repeatedly complained about the violation. Mrs. Moore did not request relief from the Board of Building Code Appeals, although the Code gives the Board the explicit power to grant a variance "where practical difficulties and unnecessary hardships shall result from the strict compliance with or the enforcement of the provisions of any ordinance . . . ."[6]   Finally, in May 1974, a municipal court found Mrs. Moore guilty of violating the single-family occupancy ordinance. The court overruled her motion to dismiss the charge, rejecting her claim that the ordinance's definition of "family" is invalid on its face under the United States Constitution. The Ohio Court of Appeals affirmed on the authority of *Village of Belle Terre* v. *Boraas,* and the Ohio Supreme Court dismissed Mrs. Moore's appeal.

In my view, the appellant's claim that the ordinance in question invades constitutionally protected rights of association and privacy is in large part answered by the *Belle Terre* decision. The argument was made there that a municipality could not zone its land exclusively for single-family occupancy because to do so would interfere with protected rights of privacy or association. We rejected this contention, and held that the ordinance at issue "involve[d] no 'fundamental' right guaranteed by the Constitution, such as . . . the right of association, *NAACP* v. *Alabama,* 357 U. S. 449; . . . or any rights of privacy, cf. *Griswold* v. *Connecticut,* 381 U. S. 479; *Eisenstadt* v. *Baird,* 405 U. S. 438, 453–454." 416 U. S., at 7–8.

The *Belle Terre* decision thus disposes of the appellant's contentions to the extent they focus not on her blood relationships with her sons and grandsons but on more general

---

legal but for one of the two grandsons. One of Mrs. Moore's sons, together with his son, could have lived with Mrs. Moore under § 1341.08 (d) of the Code if they were dependent on her. The other son, provided he was "unmarried," could have been included under § 1341.08 (b).

[6] East Cleveland Building Code § 1311.02 (1965).

notions about the "privacy of the home." Her suggestion that every person has a constitutional right permanently to share his residence with whomever he pleases, and that such choices are "beyond the province of legitimate governmental intrusion," amounts to the same argument that was made and found unpersuasive in *Belle Terre.*

To be sure, the ordinance involved in *Belle Terre* did not prevent blood relatives from occupying the same dwelling, and the Court's decision in that case does not, therefore, foreclose the appellant's arguments based specifically on the ties of kinship present in this case. Nonetheless, I would hold, for the reasons that follow, that the existence of those ties does not elevate either the appellant's claim of associational freedom or her claim of privacy to a level invoking constitutional protection.

To suggest that the biological fact of common ancestry necessarily gives related persons constitutional rights of association superior to those of unrelated persons is to misunderstand the nature of the associational freedoms that the Constitution has been understood to protect. Freedom of association has been constitutionally recognized because it is often indispensable to effectuation of explicit First Amendment guarantees. See *NAACP* v. *Alabama ex rel. Patterson,* 357 U. S. 449, 460–461; *Bates* v. *Little Rock,* 361 U. S. 516, 523; *Shelton* v. *Tucker,* 364 U. S. 479; *NAACP* v. *Button,* 371 U. S. 415, 430–431; *Railroad Trainmen* v. *Virginia Bar,* 377 U. S. 1; *Kusper* v. *Pontikes,* 414 U. S. 51, 56–61; cf. *Edwards* v. *South Carolina,* 372 U. S. 229. But the scope of the associational right, until now, at least, has been limited to the constitutional need that created it; obviously not every "association" is for First Amendment purposes or serves to promote the ideological freedom that the First Amendment was designed to protect.

The "association" in this case is not for any purpose relating to the promotion of speech, assembly, the press, or religion. And wherever the outer boundaries of constitutional protec-

tion of freedom of association may eventually turn out to be, they surely do not extend to those who assert no interest other than the gratification, convenience, and economy of sharing the same residence.

The appellant is considerably closer to the constitutional mark in asserting that the East Cleveland ordinance intrudes upon "the private realm of family life which the state cannot enter." *Prince* v. *Massachusetts,* 321 U. S. 158, 166. Several decisions of the Court have identified specific aspects of what might broadly be termed "private family life" that are constitutionally protected against state interference. See, *e. g., Roe* v. *Wade,* 410 U. S. 113, 152–154 (woman's right to decide whether to terminate pregnancy); *Loving* v. *Virginia,* 388 U. S. 1, 12 (freedom to marry person of another race); *Griswold* v. *Connecticut,* 381 U. S. 479; *Eisenstadt* v. *Baird,* 405 U. S. 438 (right to use contraceptives); *Pierce* v. *Society of Sisters,* 268 U. S. 510, 534–535 (parents' right to send children to private schools); *Meyer* v. *Nebraska,* 262 U. S. 390 (parents' right to have children instructed in foreign language).

Although the appellant's desire to share a single-dwelling unit also involves "private family life" in a sense, that desire can hardly be equated with any of the interests protected in the cases just cited. The ordinance about which the appellant complains did not impede her choice to have or not to have children, and it did not dictate to her how her own children were to be nurtured and reared. The ordinance clearly does not prevent parents from living together or living with their unemancipated offspring.

But even though the Court's previous cases are not directly in point, the appellant contends that the importance of the "extended family" in American society requires us to hold that her decision to share her residence with her grandsons may not be interfered with by the State. This decision, like the decisions involved in bearing and raising children, is said

to be an aspect of "family life" also entitled to substantive protection under the Constitution. Without pausing to inquire how far under this argument an "extended family" might extend, I cannot agree.[7] When the Court has found that the Fourteenth Amendment placed a substantive limitation on a State's power to regulate, it has been in those rare cases in which the personal interests at issue have been deemed " 'implicit in the concept of ordered liberty.' " See *Roe* v. *Wade, supra,* at 152, quoting *Palko* v. *Connecticut,* 302 U. S. 319, 325. The interest that the appellant may have in permanently sharing a single kitchen and a suite of contiguous rooms with some of her relatives simply does not rise to that level. To equate this interest with the fundamental decisions to marry and to bear and raise children is to extend the limited substantive contours of the Due Process Clause beyond recognition.

The appellant also challenges the single-family occupancy ordinance on equal protection grounds. Her claim is that the city has drawn an arbitrary and irrational distinction between groups of people who may live together as a "family" and those who may not. While acknowledging the city's right to preclude more than one family from occupying a single-dwelling unit, the appellant argues that the purposes of the single-family occupancy law would be equally served by an ordinance that did not prevent her from sharing her residence with her two sons and their sons.

This argument misconceives the nature of the constitutional inquiry. In a case such as this one, where the challenged

---

[7] The opinion of MR. JUSTICE POWELL and MR. JUSTICE BRENNAN's concurring opinion both emphasize the traditional importance of the extended family in American life. But I fail to understand why it follows that the residents of East Cleveland are constitutionally prevented from following what MR. JUSTICE BRENNAN calls the "pattern" of "white suburbia," even though that choice may reflect "cultural myopia." In point of fact, East Cleveland is a predominantly Negro community, with a Negro City Manager and City Commission.

ordinance intrudes upon no substantively protected constitutional right, it is not the Court's business to decide whether its application in a particular case seems inequitable, or even absurd. The question is not whether some other ordinance, drafted more broadly, might have served the city's ends as well or almost as well. The task, rather, is to determine if East Cleveland's ordinance violates the Equal Protection Clause of the United States Constitution. And in performing that task, it must be borne in mind that "[w]e deal with economic and social legislation where legislatures have historically drawn lines which we respect against the charge of violation of the Equal Protection Clause if the law be ' "reasonable, not arbitrary" ' (quoting *Royster Guano Co.* v. *Virginia,* 253 U. S. 412, 415) and bears 'a rational relationship to a [permissible] state objective.' *Reed* v. *Reed,* 404 U. S. 71, 76." *Village of Belle Terre* v. *Boraas,* 416 U. S., at 8. "[E]very line drawn by a legislature leaves some out that might well have been included. That exercise of discretion, however, is a legislative, not a judicial, function." *Ibid.* (footnote omitted).[8]

Viewed in the light of these principles, I do not think East Cleveland's definition of "family" offends the Constitution. The city has undisputed power to ordain single-family residen-

---

[8] The observation of Mr. Justice Holmes quoted in the *Belle Terre* opinion, 416 U. S., at 8 n. 5, bears repeating here.

"When a legal distinction is determined, as no one doubts that it may be, between night and day, childhood and maturity, or any other extremes, a point has to be fixed or a line has to be drawn, or gradually picked out by successive decisions, to mark where the change takes place. Looked at by itself without regard to the necessity behind it the line or point seems arbitrary. It might as well or nearly as well be a little more to one side or the other. But when it is seen that a line or point there must be, and that there is no mathematical or logical way of fixing it precisely, the decision of the legislature must be accepted unless we can say that it is very wide of any reasonable mark." *Louisville Gas Co.* v. *Coleman,* 277 U. S. 32, 41 (dissenting opinion).

tial occupancy. *Village of Belle Terre* v. *Boraas, supra; Euclid* v. *Ambler Realty Co.*, 272 U. S. 365. And that power plainly carries with it the power to say what a "family" is. Here the city has defined "family" to include not only father, mother, and dependent children, but several other close relatives as well. The definition is rationally designed to carry out the legitimate governmental purposes identified in the *Belle Terre* opinion: "The police power is not confined to elimination of filth, stench, and unhealthy places. It is ample to lay out zones where family values, youth values, and the blessings of quiet seclusion and clean air make the area a sanctuary for people." 416 U. S., at 9.[9]

Obviously, East Cleveland might have as easily and perhaps as effectively hit upon a different definition of "family." But a line could hardly be drawn that would not sooner or later become the target of a challenge like the appellant's. If "family" included all of the householder's grandchildren there would doubtless be the hard case of an orphaned niece or nephew. If, as the appellant suggests, a "family" must include all blood relatives, what of longtime friends? The point is that any definition would produce hardships in some cases without materially advancing the legislative purpose. That this ordinance also does so is no reason to hold it unconstitutional, unless we are to use our power to interpret the United States Constitution as a sort of generalized authority to correct seeming inequity wherever it surfaces. It is not for us to rewrite the ordinance, or substitute our judgment for

---

[9] The appellant makes much of East Cleveland Housing Code § 1351.03 (1966), which prescribes a minimum habitable floor area per person; she argues that because the municipality has chosen to establish a specific density control the single-family ordinance can have no role to play. It is obvious, however, that § 1351.03 is directed not at preserving the character of a residential area but at establishing minimum health and safety standards.

the discretion of the prosecutor who elected to initiate this litigation.[10]

In this connection the variance provisions of East Cleveland's Building Code assume special significance, for they show that the city recognized the difficult problems its ordinances were bound to create in particular cases, and provided a means to solve at least some of them. Section 1311.01 of the Code establishes a Board of Building Code Appeals. Section 1311.02 then provides, in pertinent part:

"The Board of Building Code Appeals shall determine all matters properly presented to it and where practical difficulties and unnecessary hardships shall result from the strict compliance with or the enforcement of the provisions of any ordinance for which it is designated as

---

[10] MR. JUSTICE STEVENS, in his opinion concurring in the judgment, frames the issue in terms of the "appellant's right to use her own property as she sees fit." *Ante,* at 513. Focusing on the householder's property rights does not substantially change the constitutional analysis. If the ordinance is invalid under the Equal Protection Clause as to those classes of people whose occupancy it forbids, I should suppose it is also invalid as an arbitrary intrusion upon the property owner's rights to have them live with her. On the other hand, if the ordinance is a rational attempt to promote "the city's interest in preserving the character of its neighborhoods," *Young* v. *American Mini Theatres,* 427 U. S. 50, 71 (opinion of STEVENS, J.), it is consistent with the Equal Protection Clause and a permissible restriction on the use of private property under *Euclid* v. *Ambler Realty Co.,* 272 U. S. 365, and *Nectow* v. *Cambridge,* 277 U. S. 183.

The state cases that MR. JUSTICE STEVENS discusses do not answer this federal constitutional issue. For the most part, they deal with state-law issues concerning the proper statutory construction of the term "family," and they indicate only that state courts have been reluctant to extend ambiguous single-family zoning ordinances to nontransient, single-housekeeping units. By no means do they establish that narrow definitions of the term "family" are unconstitutional.

Finally, MR. JUSTICE STEVENS calls the city to task for failing "to explain the need" for enacting this particular ordinance. *Ante,* at 520. This places the burden on the wrong party.

> the Board of Appeals, such Board shall have the power to grant variances in harmony with the general intent of such ordinance and to secure the general welfare and substantial justice in the promotion of the public health, comfort, convenience, morals, safety and general welfare of the City."

The appellant did not request a variance under this section, although she could have done so. While it is impossible to know whether such a request would have been granted, her situation appears to present precisely the kind of "practical difficulties" and "unnecessary hardships" that the variance provisions were designed to accommodate.

This is not to say that the appellant was obligated to exhaust her administrative remedy before defending this prosecution on the ground that the single-family occupancy ordinance violates the Equal Protection Clause. In assessing her claim that the ordinance is "arbitrary" and "irrational," however, I think the existence of the variance provisions is particularly persuasive evidence to the contrary. The variance procedure, a traditional part of American land-use law, bends the straight lines of East Cleveland's ordinances, shaping their contours to respond more flexibly to the hard cases that are the inevitable byproduct of legislative linedrawing.

For these reasons, I think the Ohio courts did not err in rejecting the appellant's constitutional claims. Accordingly, I respectfully dissent.

Mr. Justice White, dissenting.

The Fourteenth Amendment forbids any State to "deprive any person of life, liberty, or property, without due process of law," or to "deny to any person within its jurisdiction the equal protection of the laws." Both provisions are invoked in this case in an attempt to invalidate a city zoning ordinance.

## I

The emphasis of the Due Process Clause is on "process." As Mr. Justice Harlan once observed, it has been "ably and insistently argued in response to what were felt to be abuses by this Court of its reviewing power," that the Due Process Clause should be limited "to a guarantee of procedural fairness." *Poe* v. *Ullman,* 367 U. S. 497, 540 (1961) (dissenting opinion). These arguments had seemed "persuasive" to Justices Brandeis and Holmes, *Whitney* v. *California,* 274 U. S. 357, 373 (1927), but they recognized that the Due Process Clause, by virtue of case-to-case "judicial inclusion and exclusion," *Davidson* v. *New Orleans,* 96 U. S. 97, 104 (1878), had been construed to proscribe matters of substance, as well as inadequate procedures, and to protect from invasion by the States "all fundamental rights comprised within the term liberty." *Whitney* v. *California, supra,* at 373.

Mr. Justice Black also recognized that the Fourteenth Amendment had substantive as well as procedural content. But believing that its reach should not extend beyond the specific provisions of the Bill of Rights, see *Adamson* v. *California,* 332 U. S. 46, 68 (1947) (dissenting opinion), he never embraced the idea that the Due Process Clause empowered the courts to strike down merely unreasonable or arbitrary legislation, nor did he accept Mr. Justice Harlan's consistent view. See *Griswold* v. *Connecticut,* 381 U. S. 479, 507 (1965) (Black, J., dissenting), and *id.,* at 499 (Harlan, J., concurring in judgment). Writing at length in dissent in *Poe* v. *Ullman, supra,* at 543, Mr. Justice Harlan stated the essence of his position as follows:

> "This 'liberty' is not a series of isolated points pricked out in terms of the taking of property; the freedom of speech, press, and religion; the right to keep and bear arms; the freedom from unreasonable searches and sei-

zures; and so on. It is a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints, see *Allgeyer* v. *Louisiana,* 165 U. S. 578; *Holden* v. *Hardy,* 169 U. S. 366; *Booth* v. *Illinois,* 184 U. S. 425; *Nebbia* v. *New York,* 291 U. S. 502; *Skinner* v. *Oklahoma,* 316 U. S. 535, 544 (concurring opinion); *Schware* v. *Board of Bar Examiners,* 353 U. S. 232, and which also recognizes, what a reasonable and sensitive judgment must, that certain interests require particularly careful scrutiny of the state needs asserted to justify their abridgment. Cf. *Skinner* v. *Oklahoma, supra; Bolling* v. *Sharpe,* [347 U. S. 497 (1954)]."

This construction was far too open ended for Mr. Justice Black. For him, *Meyer* v. *Nebraska,* 262 U. S. 390 (1923), and *Pierce* v. *Society of Sisters,* 268 U. S. 510 (1925), as substantive due process cases, were as suspect as *Lochner* v. *New York,* 198 U. S. 45 (1905), *Coppage* v. *Kansas,* 236 U. S. 1 (1915), and *Adkins* v. *Children's Hospital,* 261 U. S. 525 (1923). In his view, *Ferguson* v. *Skrupa,* 372 U. S. 726 (1963), should have finally disposed of them all. But neither *Meyer* nor *Pierce* has been overruled, and recently there have been decisions of the same genre—*Roe* v. *Wade,* 410 U. S. 113 (1973); *Loving* v. *Virginia,* 388 U. S. 1 (1967); *Griswold* v. *Connecticut, supra;* and *Eisenstadt* v. *Baird,* 405 U. S. 438 (1972). Not all of these decisions purport to rest on substantive due process grounds, compare *Roe* v. *Wade, supra,* at 152–153, with *Eisenstadt* v. *Baird, supra,* at 453–454, but all represented substantial reinterpretations of the Constitution.

Although the Court regularly proceeds on the assumption that the Due Process Clause has more than a procedural dimension, we must always bear in mind that the substantive content of the Clause is suggested neither by its language nor by preconstitutional history; that content is nothing more than the accumulated product of judicial interpretation of

the Fifth and Fourteenth Amendments. This is not to suggest, at this point, that any of these cases should be overruled, or that the process by which they were decided was illegitimate or even unacceptable, but only to underline Mr. Justice Black's constant reminder to his colleagues that the Court has no license to invalidate legislation which it thinks merely arbitrary or unreasonable. And no one was more sensitive than Mr. Justice Harlan to any suggestion that his approach to the Due Process Clause would lead to judges "roaming at large in the constitutional field." *Griswold* v. *Connecticut, supra,* at 502. No one proceeded with more caution than he did when the validity of state or federal legislation was challenged in the name of the Due Process Clause.

This is surely the preferred approach. That the Court has ample precedent for the creation of new constitutional rights should not lead it to repeat the process at will. The Judiciary, including this Court, is the most vulnerable and comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or even the design of the Constitution. Realizing that the present construction of the Due Process Clause represents a major judicial gloss on its terms, as well as on the anticipation of the Framers, and that much of the underpinning for the broad, substantive application of the Clause disappeared in the conflict between the Executive and the Judiciary in the 1930's and 1940's, the Court should be extremely reluctant to breathe still further substantive content into the Due Process Clause so as to strike down legislation adopted by a State or city to promote its welfare. Whenever the Judiciary does so, it unavoidably pre-empts for itself another part of the governance of the country without express constitutional authority.

## II

Accepting the cases as they are and the Due Process Clause as construed by them, however, I think it evident that the

threshold question in any due process attack on legislation, whether the challenge is procedural or substantive, is whether there is a deprivation of life, liberty, or property. With respect to "liberty," the statement of Mr. Justice Harlan in *Poe* v. *Ullman,* quoted *supra,* at 504, most accurately reflects the thrust of prior decisions—that the Due Process Clause is triggered by a variety of interests, some much more important than others. These interests have included a wide range of freedoms in the purely commercial area such as the freedom to contract and the right to set one's own prices and wages. *Meyer* v. *Nebraska, supra,* at 399, took a characteristically broad view of "liberty":

> "While this Court has not attempted to define with exactness the liberty thus guaranteed, the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowleldge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men."

As I have said, *Meyer* has not been overruled nor its definition of liberty rejected. The results reached in some of the cases cited by *Meyer* have been discarded or undermined by later cases, but those cases did not cut back the definition of liberty espoused by earlier decisions. They disagreed only, but sharply, as to the protection that was "due" the particular liberty interests involved. See, for example, *West Coast Hotel Co.* v. *Parrish,* 300 U. S. 379 (1937), overruling *Adkins* v. *Children's Hospital,* 261 U. S. 525 (1923).

Just a few years ago, we recognized that while "the range of interests protected by procedural due process is not in-

finite," and while we must look to the nature of the interest rather than its weight in determining whether a protected interest is at issue, the term "liberty" has been given broad meaning in our cases. *Board of Regents* v. *Roth,* 408 U. S. 564, 570–571 (1972). "In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed. See, *e. g., Bolling* v. *Sharpe,* 347 U. S. 497, 499–500; *Stanley* v. *Illinois,* 405 U. S. 645." *Id.,* at 572.

It would not be consistent with prior cases to restrict the liberties protected by the Due Process Clause to those fundamental interests "implicit in the concept of ordered liberty." *Ante,* at 537. *Palko* v. *Connecticut,* 302 U. S. 319 (1937), from which this much-quoted phrase is taken, *id.,* at 325, is not to the contrary. *Palko* was a criminal case, and the issue was thus not whether a protected liberty interest was at stake but what protective process was "due" that interest. The Court used the quoted standard to determine which of the protections of the Bill of Rights was due a criminal defendant in a state court within the meaning of the Fourteenth Amendment. Nor do I think the broader view of "liberty" is inconsistent with or foreclosed by the dicta in *Roe* v. *Wade,* 410 U. S., at 152, and *Paul* v. *Davis,* 424 U. S. 693, 713 (1976). These cases at most assert that only fundamental liberties will be given *substantive* protection; and they may be understood as merely identifying certain fundamental interests that the Court has deemed deserving of a heightened degree of protection under the Due Process Clause.

It seems to me that Mr. Justice Douglas was closest to the mark in *Poe* v. *Ullman,* 367 U. S., at 517, when he said that the trouble with the holdings of the "old Court" was not in its definition of liberty but in its definition of the protections guaranteed to that liberty—"not in entertaining inquiries concerning the constitutionality of social legislation but in applying the standards that it did."

The term "liberty" is not, therefore, to be given a crabbed construction. I have no more difficulty than MR. JUSTICE POWELL apparently does in concluding that appellant in this case properly asserts a liberty interest within the meaning of the Due Process Clause. The question is not one of liberty *vel non*. Rather, there being no procedural issue at stake, the issue is whether the precise interest involved— the interest in having more than one set of grandchildren live in her home—is entitled to such substantive protection under the Due Process Clause that this ordinance must be held invalid.

## III

Looking at the doctrine of "substantive" due process as having to do with the possible invalidity of an official rule of conduct rather than of the procedures for enforcing that rule, I see the doctrine as taking several forms under the cases, each differing in the severity of review and the degree of protection offered to the individual. First, a court may merely assure itself that there is in fact a duly enacted law which proscribes the conduct sought to be prevented or sanctioned. In criminal cases, this approach is exemplified by the refusal of courts to enforce vague statutes that no reasonable person could understand as forbidding the challenged conduct. There is no such problem here.

Second is the general principle that "liberty may not be interfered with, under the guise of protecting the public interest, by legislative action which is arbitrary or without reasonable relation to some purpose within the competency of the State to effect." *Meyer* v. *Nebraska,* 262 U. S., at 399–400. This means-end test appears to require that any statute restrictive of liberty have an ascertainable purpose and represent a rational means to achieve that purpose, whatever the nature of the liberty interest involved. This approach was part of the substantive due process doctrine

prevalent earlier in the century, and it made serious inroads on the presumption of constitutionality supposedly accorded to state and federal legislation. But with *Nebbia* v. *New York,* 291 U. S. 502 (1934), and other cases of the 1930's and 1940's such as *West Coast Hotel Co.* v. *Parrish, supra,* the courts came to demand far less from and to accord far more deference to legislative judgments. This was particularly true with respect to legislation seeking to control or regulate the economic life of the State or Nation. Even so, "while the legislative judgment on economic and business matters is 'well-nigh conclusive' . . . , it is not beyond judicial inquiry." *Poe* v. *Ullman, supra,* at 518 (Douglas, J., dissenting). No case that I know of, including *Ferguson* v. *Skrupa,* 372 U. S. 726 (1963), has announced that there is some legislation with respect to which there no longer exists a means-ends test as a matter of substantive due process law. This is not surprising, for otherwise a protected liberty could be infringed by a law having no purpose or utility whatsoever. Of course, the current approach is to deal more gingerly with a state statute and to insist that the challenger bear the burden of demonstrating its unconstitutionality; and there is a broad category of cases in which substantive review is indeed mild and very similar to the original thought of *Munn* v. *Illinois,* 94 U. S. 113, 132 (1877), that "if a state of facts could exist that would justify such legislation," it passes its initial test.

There are various "liberties," however, which require that infringing legislation be given closer judicial scrutiny, not only with respect to existence of a purpose and the means employed, but also with respect to the importance of the purpose itself relative to the invaded interest. Some interests would appear almost impregnable to invasion, such as the freedoms of speech, press, and religion, and the freedom from cruel and unusual punishments. Other interests, for example, the right of association, the right to vote, and various

claims sometimes referred to under the general rubric of the right to privacy, also weigh very heavily against state claims of authority to regulate. It is this category of interests which, as I understand it, Mr. Justice Stewart refers to as " 'implicit in the concept of ordered liberty.' " *Ante*, at 537. Because he would confine the reach of substantive due process protection to interests such as these and because he would not classify in this category the asserted right to share a house with the relatives involved here, he rejects the due process claim.

Given his premise, he is surely correct. Under our cases, the Due Process Clause extends substantial protection to various phases of family life, but none requires that the claim made here be sustained. I cannot believe that the interest in residing with more than one set of grandchildren is one that calls for any kind of heightened protection under the Due Process Clause. To say that one has a personal right to live with all, rather than some, of one's grandchildren and that this right is implicit in ordered liberty is, as my Brother Stewart says, "to extend the limited substantive contours of the Due Process Clause beyond recognition." *Ibid.* The present claim is hardly one of which it could be said that "neither liberty nor justice would exist if [it] were sacrificed." *Palko* v. *Connecticut*, 302 U. S., at 326.

Mr. Justice Powell would apparently construe the Due Process Clause to protect from all but quite important state regulatory interests any right or privilege that in his estimate is deeply rooted in the country's traditions. For me, this suggests a far too expansive charter for this Court and a far less meaningful and less confining guiding principle than Mr. Justice Stewart would use for serious substantive due process review. What the deeply rooted traditions of the country are is arguable; which of them deserve the protection of the Due Process Clause is even more debatable. The suggested view would broaden enormously the horizons of

the Clause; and, if the interest involved here is any measure of what the States would be forbidden to regulate, the courts would be substantively weighing and very likely invalidating a wide range of measures that Congress and state legislatures think appropriate to respond to a changing economic and social order.

Mrs. Moore's interest in having the offspring of more than one dependent son live with her qualifies as a liberty protected by the Due Process Clause; but, because of the nature of that particular interest, the demands of the Clause are satisfied once the Court is assured that the challenged proscription is the product of a duly enacted or promulgated statute, ordinance, or regulation and that it is not wholly lacking in purpose or utility. That under this ordinance any number of unmarried children may reside with their mother and that this number might be as destructive of neighborhood values as one or more additional grandchildren is just another argument that children and grandchildren may not constitutionally be distinguished by a local zoning ordinance.

That argument remains unpersuasive to me. Here the head of the household may house himself or herself and spouse, their parents, and any number of their unmarried children. A fourth generation may be represented by only one set of grandchildren and then only if born to a dependent child. The ordinance challenged by appellant prevents her from living with both sets of grandchildren only in East Cleveland, an area with a radius of three miles and a population of 40,000. Brief for Appellee 16 n. 1. The ordinance thus denies appellant the opportunity to live with all her grandchildren in this particular suburb; she is free to do so in other parts of the Cleveland metropolitan area. If there is power to maintain the character of a single-family neighborhood, as there surely is, some limit must be placed on the reach of the "family." Had it been our task to legislate, we

might have approached the problem in a different manner than did the drafters of this ordinance; but I have no trouble in concluding that the normal goals of zoning regulation are present here and that the ordinance serves these goals by limiting, in identifiable circumstances, the number of people who can occupy a single household. The ordinance does not violate the Due Process Clause.

## IV

For very similar reasons, the equal protection claim must fail, since it is not to be judged by the strict scrutiny standard employed when a fundamental interest or suspect classification is involved, see, *e. g., Dunn* v. *Blumstein,* 405 U. S. 330 (1972), and *Korematsu* v. *United States,* 323 U. S. 214 (1944), or by the somewhat less strict standard of *Craig* v. *Boren,* 429 U. S. 190 (1976), *Califano* v. *Webster,* 430 U. S. 313 (1977), *Reed* v. *Reed,* 404 U. S. 71 (1971), and *Royster Guano Co.* v. *Virginia,* 253 U. S. 412, 415 (1920). Rather, it is the generally applicable standard of *McGowan* v. *Maryland,* 366 U. S. 420, 425 (1961):

> "The constitutional safeguard [of the Equal Protection Clause] is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it."

See also *Dandridge* v. *Williams,* 397 U. S. 471 (1970); *Massachusetts Bd. of Retirement* v. *Murgia,* 427 U. S. 307 (1976). Under this standard, it is not fatal if the purpose of the law is not articulated on its face, and there need be only a rational relation to the ascertained purpose.

On this basis, as already indicated, I have no trouble in discerning a rational justification for an ordinance that permits the head of a household to house one, but not two, dependent sons and their children.

Respectfully, therefore, I dissent and would affirm the judgment.