PHILLIPS, Senior Circuit Judge,
dissenting:
With all respect for the majority’s understandable dismay at the course of administrative bungling by state officials that this case reveals, I do not believe that the state’s re-incarceration of this petitioner constituted a violation of substantive due process entitling him to the release from custody that he seeks. Accordingly, I dissent.
Courts now considering any claim of substantive due process violation must look for principal guidance to the Supreme Court’s most recent deliverances on the meaning and proper method of judicial analysis of the concept in County of Sacramento v. Lewis, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), and Washington v. Glucksberg, 521 U.S. 702, 117 S.Ct. 2258 and 2302, 138 L.Ed.2d 772 (1997). Though those decisions evoked a multiplicity of opinions that reflect lingering disagreements within Court majorities on the proper methodology for assessing such claims — particularly those involving executive action — I take them to establish or reaffirm for our purposes the following propositions.
1. At the outset, they remind that, as a general proposition, we must be “ ‘reluctant to expand the concept of substantive due process because guideposts for responsible decision-making in this uncharted area are scarce and open-ended,’” Glucksberg, 117 S.Ct. at 2267 (quoting Collins v. Harker Heights, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)), which means that we, like the Supreme Court, must “ ‘exercise the utmost care whenever we are asked to break new ground in this field,’ [Collins, 503 U.S. at 125, 112 S.Ct. 1061], lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of [judges], [Moore v. City of East Cleveland, 431 U.S. 494, 502, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977)].” Glucksberg, 117 S.Ct. at 2268; see also Lewis, 118 S.Ct. at 1714 (noting-traditional reluctance of Court to expand concept).
2. Where, as here, the claimed violation is by executive action rather than by legislative enactment, judicial analysis should consider as a “threshold question” whether the executive action was so “egregious, so outrageous, that it may fairly be said to shock the' contemporary conscience.” Lewis, 118 S.Ct. at 1717 n. 8. If it does not, the claim fails on that account. If it does, inquiry must turn to whether the claimed right, if not an enumerated one, is entitled, on the basis of precedent or of historical protections afforded it, to judicial recognition as a substantive due process right to be free of such executive action. See id[1]
*282 3. If inquiry is required (or undertaken) as to whether the right asserted is entitled to recognition as one of substantive due process, the question is whether it is one of “those fundamental rights and liberties which are, objectively, ‘deeply rooted in this Nation’s history and tradition.’ ” Glucksberg, 117 S.Ct. at 2268 (quoting Moore, 431 U.S. at 503, 97 S.Ct. 1932), being so “ ‘implicit in the concept of ordered liberty’ ... that ‘neither liberty nor justice would exist if they were sacrificed.’ ” Id. (quoting Palko v. Connecticut, 302 U.S. 319, 325, 326, 58 S.Ct. 149, 82 L.Ed. 288 (1937)). And to answer that question requires a “‘careful description’ of the asserted fundamental liberty interest.” Id. (quoting Reno v. Flores, 507 U.S. 292, 302 (1993)).
This prescribed methodology, avowedly designed in its threshold “shocks-the-conscience” inquiry to guard against “demoting]” the Constitution to a “font of tort law,” Lewis, 118 S.Ct. at 1717 n. 8, and, in its “fundamental-liberty-interest” inquiry, to “rein in the subjective elements that are necessarily present in due-process judicial review,” Glucksberg, 117 S.Ct. at 2268, is a most stringent one. Though it builds on previous substantive due process jurisprudence, it seems to me clearly to tighten the doctrinal screws by “defining-up” both the level of executive culpability sufficiently “egregious” to “shock the contemporary conscience” and the level of specificity at which asserted substantive due process rights are to be sought in history, precedent and tradition.
Applying that tightened methodology here, I do not believe the challenged conduct can be declared to violate any substantive due process right asserted by this petitioner. First off, I do not believe the conduct qualifies as a conscience-shocker in the required sense.
The core of the concept of due process— procedural and substantive — is protection against “arbitrary action of government,” Lewis, 118 S.Ct. at 1716 (quoting Wolff v. McDonnell, 418 U.S. 539, 558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)), and “only the most egregious official conduct can be said to be ‘arbitrary in the constitutional sense.’ ” Id. (quoting Collins, 503 U.S. at 129, 112 S.Ct. 1061). The “shocks the conscience” test is aimed at identifying executive conduct of that degree of culpability and therefore appropriately poses the first, antecedent, question about any claim that particular conduct violated a substantive due process right.
The test is concededly a most imprecise one, being “no calibrated yard stick,” id. 118 *283 S.Ct. at 1717, and “laden with subjective assessments,” id. at 1722 (Kennedy, J. concurring). But it surely gets at what has to be determined — -whether government conduct has been simply “arbitrary,” without reason. And, some judicial guidelines have emerged to flesh out and put at least minimum bounds on the degree of culpability it seeks to capture.
Simple negligence never can suffice to make executive conduct conscience-shocking in the required sense, no matter what the right infringed or the injury inflicted. Id. at 1718(eiting Davidson v. Cannon, 474 U.S. 344, 347-48, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986)). And while intended conduct is that “most likely” to meet the test, even that alone will not suffice; the conduct must be “intended to injure in some way unjustifiable by any government interest." Id. (emphasis added). What the test seeks to identify is conduct by executive officials which involves “abusing [their] power, or employing it as an instrument of oppression.” Collins, 503 U.S. at 126, 112 S.Ct. 1061 (quotation omitted). Finally, application of this test “demands an exact analysis of circumstances,” Lewis, 118 S.Ct. at 1718, because “ ‘[t]hat which may, in one setting, constitute a denial of fundamental fairness, shocking to the universal Sense of justice, may, in other circumstances, and in the light of other considerations, fall short of such denial.’ ” Id. at 1719 (quoting Betts v. Brady, 316 U.S. 455, 462, 62 S.Ct. 1252, 86 L.Ed. 1595 (1942)).
As a first step in applying the test to the specific conduct at issue here, we should take a look at how executive officials and courts generally may have responded to the problem of whether an erroneously released prisoner should be reincarcerated. Though unlikely to demonstrate conclusively that the executive act we assess was or was not “conscience-shocking,” hence arbitrary in the constitutional sense, the response of other officials and courts when confronted with generally comparable problems might provide helpful context for assessing its culpability. See id. 118 S.Ct. at 1717 n. 8.
The first thing revealed by even a cursory look at the available sources — judicial decisions[2] and academic commentary — is that cases involving government failures to take convicted criminals into custody and premature releases of prisoners are surprisingly widespread and recurring in both the state and federal penal systems. See Gabriel J. Chin, Getting Out of Jail Free: Sentence Credit for Periods of Mistaken Liberty, 45 Cath. U.L.Rev. 403 (1996) (collecting cases).[3] The erroneous release here was not, therefore, to start with so unique an occurrence in overall penal system administration as by that fact alone to suggest arbitrariness in the overall administrative process.
*284 Next, it would appear that traditional and contemporary executive practice once the error is discovered has been routinely to incarcerate, rejecting any administrative claims of entitlement to freedom.[4] Neither, therefore, was the decision to reincarcerate here, rejecting the administrative claim, so much at odds with customary executive practice as to suggest arbitrariness on that account alone.
Looking past these general indications of the widespread extent of the phenomenon and the traditional executive practice in dealing with it to how the courts have dealt with it, we see several overlapping patterns that require differentiation for our purposes.
In one group of eases, challenges to rein-carceration have been made and decided in whole or part on non-constitutional theories of “estoppel,” see, e.g., Johnson v. Williford, 682 F.2d 868(9th Cir.1982) (alternative ground), or “improper installment sentence.” See, e.g., White v. Pearlman, 42 F.2d 788 (10th Cir.1930); see generally Dunne v. Keohane, 14 F.3d 335, 336-37 (7th Cir.) (Posner, C.J.) (noting that common law rule prohibiting government from “delay[ing] the expiration of the sentence either by postponing [its] commencement ... or by releasing the prisoner for a time and then reimprisoning him” is not a “constitutional command”), cert. denied, 511 U.S. 1149, 114 S.Ct. 2182, 128 L.Ed.2d 900 (1994). Because decisions applying these common law theories are not concerned with any threshold question of executive culpability, they have nothing to contribute on “the standard[] of blame,” Lewis, 118 S.Ct. at 1717 n. 8, to be used in applying the constitutional shoeks-the-con-science test. See id. at 1717-18(noting critical difference between minimum constitutional and non-constitutional culpability levels).
In another overlapping category of cases, the prisoner has sought as relief that he be given credit on his remaining sentence for the time spent in erroneous release. See, e.g., Green v. Christiansen, 732 F.2d 1397 (9th Cir.1984); United States v. Merritt, 478 F.Supp. 804 (D.D.C.1979). These cases have no relevance to whether what was done here violated the right asserted by this petitioner. He was given credit against his remaining sentence for the time spent on erroneous release, (see J.A. at 34), and his claim is for the more drastic remedy of outright release to parole under the conditions erroneously granted.
When these two overlapping categories of cases are excluded as possible sources of a shoeks-the-conscience benchmark for claims such as Hawkins’s, only one category remains. It consists of cases in which a convicted criminal has sought release (either outright or to an erroneously granted parole) specifically on federal constitutional due process grounds and the courts have decided the claims, up or down, on that basis. Interestingly, almost all the cases decided on constitutional grounds have involved claims based on a unique sub-constitutional theory of “waiver of jurisdiction.” Usually traced to Shields v. Beto, 370 F.2d 1003 (5th Cir.1967), it employs the Active notion that by prolonged failure to incarcerate a convict who “owes it time,” a government may be held to have “waived its jurisdiction” to do so at some point in time and under certain circumstances, and that to incarcerate thereafter without “jurisdiction” violates due process.[5] *285 In the overwhelming majority of cases in which this special “due process” theory has been invoked, the claims have been rejected on their widely varying facts.[6] Only a handful of decisions have found due process violations on this basis.[7]
Although these eases apply constitutional due process theory, they do not provide a serviceable benchmark for applying the threshold “conscience-shocking” test mandated by Lewis. None, of course, specifically applies that test as an “antecedent”, independent inquiry into government culpability. Most, as indicated, reject the due process challenge on the facts. The few that uphold challenges are far too few in the overall mix and too varied on their facts to provide any firm legal norm for assessing the required culpability level under Lewis’s threshold test.
History and precedent thus inform our threshold inquiry with little except that the administrative error that occasioned the challenged decision is one too frequently made in penal systems administration to raise any presumption of arbitrariness “in the constitutional sense,” Lewis, 118 S.Ct. at 1716 (quotation omitted), whenever it occurs, and that the apparently routine executive practice when the error has been discovered is to reincarcerate, no matter what the circumstances. Judicial decisions on challenges to such executive decisions provide no firm legal norm or benchmark for applying the test. Most in fact have upheld the executive decision to reincarcerate, finding no violation of the claimed legal or constitutional right to remain free. Those that have found .violations — even the very few. that have found violation of constitutional due.process right— have done so by analyses that did not address as an independent, “antecedent,” question whether the challenged decision to rein-carcerate was sufficiently “egregious” to be “arbitrary in the constitutional sense.” Id. at 1716 & 1717 n. 8 (quotation omitted).
Here, therefore, the test must be applied simply by considering without benefit of any helpful guidance from those external sources whether the decision to reincarcerate was, within the threshold culpability test as most recently explained in Lems, “shocking to] the contemporary conscience.” Id. at 1717 n. 8.
I do not think it possible to make that drastic judgment about this decision. Consider the critical circumstances before the Parole Commission whose decision to revoke the erroneously granted parole is the challenged executive act.
In 1981 Hawkins had been convicted in North Carolina state court on a drug trafficking offense. Based on previous 1972 convictions in Georgia of rape and aggravated assault with intent to commit rape and a 1976 conviction in Guilford County, North Carolina for armed robbery, he was sentenced as an habitual felon to 50 years imprisonment and to a concurrent 10-year sentence on the drug trafficking offense. *286 See State v. Simmons, 56 N.C.App. 34, 286 S.E.2d 898, 900 (N.C.Ct.App.1982). At the time, he had an extensive record of other arrests and convictions, some under the surname “Simmons,” dating back to 1967. These included a 1967 conviction for larceny and receiving; a 1969 conviction for assault on a female; a 1978 conviction for escape from work release; a 1976 grand jury charge of second degree rape that was dismissed; and a 1975 Delaware charge of resisting arrest that was nol prossed. (See J.A. 161-62; 203-4.) In 1992, after having served eleven years of his 50-year sentence, he had been erroneously paroled under a recently enacted Community Service Parole program, designed in part to alleviate prison overcrowding, for which he was not in fact eligible. His overall prison record at the time had been a good one, with only a few rule infractions, and during his imprisonment he had obtained a bachelors degree in business management from Shaw University under a study program. (See id. at 26, 200.)
His erroneous release in 1992 was based on a Parole Case Analyst’s recommendation that cited the amount of time he had served, the prison overcrowding crisis, the fact that none of Hawkins’s prison rule infractions was assaultive, the fact that he had made some effort to improve his situation while in prison, and the fact that he would be placed on intensive supervision under the Community Service Parole program. (See id. at 200.) The recommendation had, however, noted that there was “some concern” about releasing Hawkins due to his “history of sexual assaultive behavior.” (Id.) That concern had been expressed for the record by a Parole/Probation officer who indicated his strong opposition to Hawkins’/Simmons’ release based upon the officer’s personal awareness of his criminal history and his expressed opinion that he was a “career street criminal who will continue to commit street crimes once he is out of prison.” (Id. at 156.)
During the two-year period of his release, Hawkins had lived with his brother and been continuously employed as an unskilled laborer by a manufacturing company. (See id. at 22, 26.) He had worked regularly and with good job evaluations and had violated no laws during the period, but had fallen behind in some of the community service obligations and fee payments required by the program. (See id. at 20-24, 246.)
He was taken back into custody by order of the Parole Commission when in 1994 it was realized that his release had not been authorized by law. (See id. at 34.) And, after affording him a hearing with counsel at which his return to parole status was urged on legal and humanitarian grounds, (see id. at 29-30, 120-21), the Commission had formally revoked his parole and ordered his reincarceration. (See id. at 32, 34.)
To declare the Parole Commission’s decision so “egregious and outrageous” as to “shock the contemporary conscience” under these circumstances, we would have to believe that it was infected or driven by something much worse — more blameworthy — than mere negligence or lack of proper compassion or sense of fairness or than might invoke common law principles of estoppel or fair criminal procedure or the like to hold the state to its error. To keep things in constitutional proportion, we would have to see in it a mindless “abus[e of] power,” or a deliberate exercise of power “as an instrument of oppression,” Collins, 503 U.S. at 126, 112 S.Ct. 1061 (quotation omitted), or power exercised “without any reasonable justification in the service of a legitimate governmental objective,” Lewis, 118 S.Ct. at 1716.
I do not believe the Parole Commission’s decision can be characterized as one meeting that stringent threshold constitutional test. Nothing about it suggests any element of vindictiveness or of power exercised simply to oppress. There were legitimate governmental interests and objectives a-plenty to justify the act. It rectified an error in administering applicable state parole law, thereby furthering the state’s fundamental interest in correct application of its laws. In doing so, it avoided the precedential risk of acquiescing in irregular enforcement of state law. It reincarcerated under more secure *287 custody a recognized high-risk prisoner erroneously released under a program driven largely by exigencies of prison crowding unrelated to the public interest in security against the specific risk he posed.
While the Commission’s conduct leading up to and including erroneous release on parole was bungling at every step, it could not at that stage be characterized as anything but simple negligence. And, in the end, that negligent course of conduct had nothing to do with revocation of the parole actually granted far in advance of the parole release dates about which Hawkins was several times negligently misinformed. While the Commission’s course of bungling is not a pretty picture, it has no real bearing upon the question whether revocation of the completely unpredicted earlier parole was conscience-shocking.
Finally, while the revocation undoubtedly had harsh and regrettable consequences for Hawkins’s erroneously created expectations, it did not, fortunately, interrupt any third party dependency relationship established in the interim. And, though Hawkins had not engaged in any criminal conduct during the period of his release under the “intensive supervision” of his parole, that surely could not be thought to oblige the Commission to see in this a safely demonstrated rehabilitation from Hawkins’s established pattern of assaultive behavior while not in full custody. Certainly a declination to do so could not be thought to demonstrate arbitrariness as opposed to reasoned judgment.
Because I do not believe that the Parole Commission’s decision can be declared “so egregious, so outrageous ... [as] to shock the contemporary conscience”, see Lewis, 118 S.Ct. at 1717 n. 8, I would affirm on that ground the district court’s denial of the petition. So holding, I would not reach the more fundamental issue that lies beyond: whether the specific right asserted here even concerns a liberty interest so fundamental that it is protected by the substantive component of the Due Process Clause. See id. (differentiating the issues). Because a majority of the panel has, however, held that the conduct was conscience-shocking, thereby raising the further issue, I address it briefly and, with respect, again disagree with the majority.
My reasons can be given simply and briefly. Based upon the historical evidence earlier discussed, I do not believe the liberty interest asserted here — that of remaining free on erroneously granted parole so long as the parolee did not contribute to the error and has for an appreciable time remained on good behavior to the point that his expectations for continued release from incarceration have “crystallized”[8] — is one that can be said to be “deeply rooted in this Nation’s history and traditions.” Glucksberg, 117 S.Ct. at 2268 (quoting Moore, 431 U.S. at 503, 97 S.Ct. 1932). Certainly it would seem impossible to say of such an interest that it is one of those so “‘implicit in the concept of ordered liberty,’ ... that ‘neither liberty nor justice would exist if they were sacrificed.’ ” Id. (quoting Palko, 302 U.S. at 325, 326, 58 S.Ct. 149). What history and tradition seem to indicate in their best light for petitioner is that claims of such a right have been routinely rejected when made to executive branches of government, occasionally, but not always, upheld by courts when advanced under common law theories such as estoppel, and almost always rejected by courts when advanced on constitutional grounds. For that reason, I do not believe that under current Supreme Court jurisprudence as most recently eiq>lieated in Glucksberg, the interest asserted here could be considered one entitled to substantive due process protection.[9]

. This is the position taken in Justice Souter’s opinion for the Court in Lewis, in which he was joined by Chief Justice Rehnquist and Justices *282 O'Connor, Kennedy, Ginsburg and Breyer. Lewis thus clearly holds both that the "shocks-the-conscience” test has continued vitality in actions challenging executive acts on substantive due process grounds and that in those it should be applied as a “threshold” test. What is not perfectly clear, however, is the extent to which this threshold test is to be applied independently of any consideration of what relevant history, tradition and precedent may have to say about the asserted right and its protection. Justice Souter's opinion for the Court seems in the main to posit a completely independent threshold inquiry that focuses solely on the actor's culpability, and would turn to history, tradition and precedent only after the conduct had been found conscience-shocking, and then only to determine whether history, tradition and precedent demonstrated that the right asserted was one entitled to substantive due process protection. See Lewis, 118 S.Ct. at 1717 n. 8. Responding, however, to Justice Scalia’s objection to any continued use of a shocks-the-conscience test rather than relying solely on precedent and historical protections to assess substantive due process claims, Justice Souter allowed that whether particular conduct was conscience-shocking "may be informed by a history of liberty protection, but would necessarily reflect[ ] an understanding of traditional executive behavior, of contemporary practice, and of the standard of blame applied to them.” Id.
Further on the point, Justice Kennedy, specially concurring and joined by Justice O’Connor, after expressing general skepticism about the "shocks-the-conscience" test, indicated that he thought it could not serve as a wholly independent test but only as the beginning point in a process that must take into account history, tradition and precedent in assessing the "objective character” of the challenged act. Id. at 1722 (Kennedy, J. concurring). Though Justice Souter’s opinion seemed not to require this, Justice Kennedy thought that the “reasons” given for its "not-shocking” conclusion indicated that history, tradition and precedent had been sufficiently taken into account to meet his concern. Id.
From all this, I assume that courts seeking faithfully to apply the Lewis methodology in executive act cases properly may look to history for whatever it may reveal about customary executive practices and judicial responses in comparable situations by way of establishing context for their assessments of the conduct at issue.

. Which of course reveal only the tip of what surely is a much larger set of instances, not all of which resulted in litigation.

. As a raw indication of the extent of the phenomenon, this academic commentary identifies over one hundred such cases, running back in time to 1895. Broadly speaking, the cases involve one or the other of the following factual scenarios. In "delayed incarceration cases," the relevant governmental authority fails timely to take the convicted criminal into custody. See, e.g., United States v. Martinez, 837 F.2d 861 (9th Cir.1988) (seven and one-half-year delay in prisoner’s incarceration). In "detainer cases,” a prisoner is either released from the custody of one jurisdiction notwithstanding the fact that a valid detainer has been lodged by a second jurisdiction, see, e.g., Farley v. Nelson, 469 F.Supp. 796 (D. Conn.) (defendant paroled by Maryland penitentiary and not taken into federal custody notwithstanding fact that two federal detainers were on file with the Maryland authorities), aff'd, 607 F.2d 995 (2d Cir.1979); or is released by one jurisdiction because a second jurisdiction to which he owes time has failed to file a detainer. See, e.g., Shelton v. Ciccone, 578 F.2d 1241 (8th Cir.1978) (defendant' released from state custody when a federal detainer should have been but was not lodged with state authorities). Finally, there are "early release cases” where, as in the case at hand, by some administrative error, a prisoner is prematurely released or paroled. See, e.g., Johnson v. Williford, 682 F.2d 868 (9th Cir.1982) (prisoner who was convicted and sentenced under a federal statute requiring a 10-year minimum sentence without possibility of parole was erroneously paroled). Although these categories account for the great bulk of the cases, not all of the cases fit neatly into them. See, e.g., Ex Parte Bugg, 163 Mo.App. 44, 145 S.W. 831 (Mo.Ct.App.1912) (prisoner intentionally released from custody on a suspended sentence because of fear that he was contracting tuberculosis and to allow him to "seek a change of climate”).

. This is inferred from the fact that the reported decisions overwhelmingly (perhaps exclusively) concern prisoner challenges to decisions to incarcerate. While there obviously is less incentive for government to challenge contested administrative decisions not to incarcerate, such challenges must generally be possible under typical agency review procedures. See, e.g., In Re Hawley, 98 N.J. 108, 484 A.2d 684 (N.J.1984) (holding that the prosecutor has the right and authority to appeal a decision of the State Parole Board); Mich. Comp. Laws Ann. § 791.234(7) (“The action of the parole board ... is appeal-able by ... the prosecutor-’’).

. Shields, finding antecedents of this theory (and a related one of "implied pardon”) in a few earlier federal and state cases, adopted it as circuit law in a case in which a state had reincar-cerated a prisoner 28 years after it had released him in mid-sentence to another state and 18 years after the latter state had paroled him in the absence of any detainer filing by the first state. Six years later, the Fifth Circuit took the occasion in Piper v. Estelle, 485 F.2d 245 (5th Cir.1973), to cabin in Shields facially broad rule that had seemed to rest principally on the prolonged period of government inaction, emphasizing that "lack of eager pursuit” or "lack of interest” is not enough, "[r]ather,” Piper held, "the ... action must be so affirmatively wrong or [the] *285 inaction so grossly negligent that it would be unequivocally inconsistent with fundamental principles of liberty and justice to require [that the sentence] be served....” Id. at 246 (quotation omitted). Piper's formulation of the “waiver” theory has been that ordinarily invoked by claimants and courts since that time.

. See Camper v. Norris, 36 F.3d 782 (8th Cir.1994) (finding against prisoner on the facts); Martinez, 837 F.2d 861 (same); Mobley v. Dugger, 823 F.2d 1495 (11th Cir.1987) (same); Green, 732 F.2d 1397 (same); Mathes v. Pierpont, 725 F.2d 77 (8th Cir.1984) (same); Patterson v. O’Dea. 1996 WL 554564 (6th Cir.1996) (unpublished) (same); Hallums v. Hambrick, 1994 WL 279394 (6th Cir.1994) (unpublished) (same), cert. denied, 513 U.S. 1169, 115 S.Ct. 1143, 130 L.Ed.2d 1102 (1995); Mistretta v. Whalen, 1993 WL 118074 (7th Cir.1993) (unpublished) (same); Christian v. Smith, 1991 WL 85227 (6th Cir.1991) (unpublished) (same), cert. denied, 502 U.S. 915, 112 S.Ct. 319, 116 L.Ed.2d 261 (1991); Sterling v. Maggio, 505 F.Supp. 1111 (M.D.La.1981) (same); Farley, 469 F.Supp. 796 (same); Bailey v. Ciccone, 420 F.Supp. 344 (W.D.Mo.1976) (same); Esquivel v. Estelle, 426 F.Supp. 619 (W.D.Tex.1976) (same), aff'd, 547 F.2d 309 (5th Cir.1977); Clifton v. Beto, 298 F.Supp. 1384 (S.D.Tex.1968) (same), aff'd on other grounds, 411 F.2d 1226 (5th Cir.1969); United States v. Vann, 207 F.Supp. 108 (E.D.N.Y.1962) (same); United States v. Brandt, 1987 WL 16235 (N.D.Ill. Aug.26, 1987) (unpublished) (same).

. See Shields, 370 F.2d 1003 (finding for prisoner on the facts); Johnson, 682 F.2d 868 (same); Lanier v. Williams, 361 F.Supp. 944 (E.D.N.C.1973) (same); Shelton, 578 F.2d 1241 (granting defendant evidentiary hearing on issue of waiver).

. This seems to me a fair and "careful description” of the "fundamental liberty interest” asserted by petitioner in this litigation. See Glucksberg, 117 S.Ct. at 2268 (noting necessity for such a "description” in making historical inquiry). A critical feature of the interest as asserted is its basis in "crystallized” expectations created by the passage of time, (see Appellant's Br. at 11), surely an amorphous concept upon which to ground constitutional right, particularly one as jealously guarded against subjective expansion as substantive due process.

. Hawkins's reliance on United States v. Lundien, 769 F.2d 981 (4th Cir.1985), cert. denied, 474 *288 U.S. 1064, 106 S.Ct 815, 88 L.Ed.2d 789 (1986), and United States v. Cook, 890 F.2d 672 (4th Cir.1989), as establishing circuit precedent for the existence of such a right is misplaced. Those cases considered constitutional challenges to the power of courts to increase sentences after their formal imposition. In both cases, the courts posited that at some point a prisoner’s crystallized expectations of the duration of his sentence as imposed could give rise to a due process right to its finality, but both found no such right to have arisen on the facts of the cases. See Lundien, 769 F.2d at 987; Cook, 890 F.2d at 675. Aside from the fact that the due process assumptions made in those cases were dicta in view of their specific holdings, they could not be taken to apply even as persuasive dicta in the quite different situation of the erroneously released prisoner that we consider. Neither Lundien nor Cook undertook the rigorous historical inquiry now mandated by Gluclcsberg into whether the specific right they posited — that of sentence finality— was one sufficiently rooted in history and tradition to be enforced as one of substantive due process. And had that inquiry been undertaken, it would have been an entirely different one, concerning a different subject than that required in this case. Lundien and Cook therefore have nothing to say, either as precedent or persuasive dicta, about whether the sufficiently different liberty interest asserted by Hawkins is entitled by history and tradition to substantive due process protection.